(Slip Opinion)      OCTOBER TERM, 2015      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McDONNELL *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 15–474.   Argued April 27, 2016—Decided June 27, 2016

Petitioner, former Virginia Governor Robert McDonnell, and his wife, Maureen McDonnell, were indicted by the Federal Government on honest services fraud and Hobbs Act extortion charges related to their acceptance of $175,000 in loans, gifts, and other benefits from Virginia businessman Jonnie Williams, while Governor McDonnell was in office.  Williams was the chief executive officer of Star Scientific, a Virginia-based company that had developed Anatabloc, a nutritional supplement made from anatabine, a compound found in tobacco.  Star Scientific hoped that Virginia's public universities would perform research studies on anatabine, and Williams wanted Governor McDonnell's assistance in obtaining those studies.

To convict the McDonnells, the Government was required to show that Governor McDonnell committed (or agreed to commit) an "official act" in exchange for the loans and gifts.  An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U. S. C. §201(a)(3).  According to the Government, Governor McDonnell committed at least five "official acts," including "arranging meetings" for Williams with other Virginia officials to discuss Star Scientific's product, "hosting" events for Star Scientific at the Governor's Mansion, and "contacting other government officials" concerning the research studies.

The case was tried before a jury.  The District Court instructed the jury that "official act" encompasses "acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end."

Supp. App. 69–70. Governor McDonnell requested that the court further instruct the jury that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,'" but the District Court declined to give that instruction. 792 F. 3d 478, 513 (internal quotation marks omitted). The jury convicted Governor McDonnell.

Governor McDonnell moved to vacate his convictions on the ground that the definition of "official act" in the jury instructions was erroneous. He also moved for acquittal, arguing that there was insufficient evidence to convict him, and that the Hobbs Act and honest services statute were unconstitutionally vague. The District Court denied the motions, and the Fourth Circuit affirmed.

*Held*:

1. An "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." That question or matter must involve a formal exercise of governmental power, and must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that question or matter, or agree to do so. Setting up a meeting, talking to another official, or organizing an event—without more—does not fit that definition of "official act." Pp. 13–24.

(a) The Government argues that the term "official act" encompasses nearly any activity by a public official concerning any subject, including a broad policy issue such as Virginia economic development. Governor McDonnell, in contrast, contends that statutory context compels a more circumscribed reading. Taking into account text, precedent, and constitutional concerns, the Court rejects the Government's reading and adopts a more bounded interpretation of "official act." Pp. 13–14.

(b) Section 201(a)(3) sets forth two requirements for an "official act." First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that "question, matter, cause, suit, proceeding or controversy," or agreed to do so. Pp. 14–22.

(1) The first inquiry is whether a typical meeting, call, or event is itself a "question, matter, cause, suit, proceeding or controversy." The terms "cause," "suit," "proceeding," and "controversy" connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination. Although it may be difficult to define the precise reach of those terms, a typical meeting, call, or event does not qualify. "Question" and "matter" could be defined more broadly,

but under the familiar interpretive canon *noscitur a sociis*, a "word is known by the company it keeps." *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307. Because a typical meeting, call, or event is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not count as a "question" or "matter" under §201(a)(3). That more limited reading also comports with the presumption "that statutory language is not superfluous." *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 299, n. 1. Pp. 14–16.

(2) Because a typical meeting, call, or event is not itself a question or matter, the next step is to determine whether arranging a meeting, contacting another official, or hosting an event may qualify as a "decision or action" *on* a different question or matter. That first requires the Court to establish what counts as a question or matter in this case.

Section 201(a)(3) states that the question or matter must be "pending" or "may by law be brought" before "any public official." "Pending" and "may by law be brought" suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. "May *by law* be brought" conveys something within the specific duties of an official's position. Although the District Court determined that the relevant matter in this case could be considered at a much higher level of generality as "Virginia business and economic development," Supp. App. 88, the pertinent matter must instead be more focused and concrete.

The Fourth Circuit identified at least three such questions or matters: (1) whether researchers at Virginia's state universities would initiate a study of Anatabloc; (2) whether Virginia's Tobacco Commission would allocate grant money for studying anatabine; and (3) whether Virginia's health plan for state employees would cover Anatabloc. The Court agrees that those qualify as questions or matters under §201(a)(3). Pp. 16–18.

(3) The question remains whether merely setting up a meeting, hosting an event, or calling another official qualifies as a decision or action on any of those three questions or matters. It is apparent from *United States* v. *Sun-Diamond Growers of Cal.*, 526 U. S. 398, that the answer is no. Something more is required: §201(a)(3) specifies that the public official must make a decision or take an action *on* the question or matter, or agree to do so.

For example, a decision or action to initiate a research study would qualify as an "official act." A public official may also make a decision or take an action by using his official position to exert pressure on *another* official to perform an "official act," or by using his official po-

sition to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official. A public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that he agree to do so. Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information, however, does not qualify as a decision or action on the pending question of whether to initiate the study. Pp. 18–22.

(c) The Government's expansive interpretation of "official act" would raise significant constitutional concerns. Conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. Representative government assumes that public officials will hear from their constituents and act appropriately on their concerns. The Government's position could cast a pall of potential prosecution over these relationships. This concern is substantial, as recognized by White House counsel from every administration from that of President Reagan to President Obama, as well as two bipartisan groups of former state attorneys general. The Government's interpretation also raises due process and federalism concerns. Pp. 22–24.

2. Given the Court's interpretation of "official act," the District Court's jury instructions were erroneous, and the jury may have convicted Governor McDonnell for conduct that is not unlawful. Because the errors in the jury instructions are not harmless beyond a reasonable doubt, the Court vacates Governor McDonnell's convictions. Pp. 24–28.

(a) The jury instructions lacked important qualifications, rendering them significantly overinclusive. First, they did not adequately explain to the jury how to identify the pertinent "question, matter, cause, suit, proceeding or controversy." It is possible the jury thought that a typical meeting, call, or event was itself a "question, matter, cause, suit, proceeding or controversy." If so, the jury could have convicted Governor McDonnell without finding that he committed or agreed to commit an "official act," as properly defined.

Second, the instructions did not inform the jury that the "question, matter, cause, suit, proceeding or controversy" must be more specific and focused than a broad policy objective. As a result, the jury could have thought that the relevant "question, matter, cause, suit, proceeding or controversy" was something as nebulous as Virginia economic development, and convicted Governor McDonnell on that basis.

Third, the District Court did not instruct the jury that to convict Governor McDonnell, it had to find that he made a decision or took an action—or agreed to do so—on the identified "question, matter,

Syllabus

cause, suit, proceeding or controversy," as properly defined. At trial, several of Governor McDonnell's subordinates testified that he asked them to attend a meeting, not that he expected them to do anything other than that. If that testimony reflects what Governor McDonnell agreed to do at the time he accepted the loans and gifts from Williams, then he did not agree to make a decision or take an action on any of the three questions or matters described by the Fourth Circuit. Pp. 24–27.

(b) Governor McDonnell raises two additional claims. First, he argues that the honest services statute and the Hobbs Act are unconstitutionally vague. The Court rejects that claim. For purposes of this case, the parties defined those statutes with reference to §201 of the federal bribery statute. Because the Court interprets the term "official act" in §201(a)(3) in a way that avoids the vagueness concerns raised by Governor McDonnell, it declines to invalidate those statutes under the facts here. Second, Governor McDonnell argues that there is insufficient evidence that he committed an "official act," or agreed to do so. Because the parties have not had an opportunity to address that question in light of the Court's interpretation of "official act," the Court leaves it for the Court of Appeals to resolve in the first instance. Pp. 27–28.

792 F. 3d 478, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 15–474

## ROBERT F. MCDONNELL, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### [June 27, 2016]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In 2014, the Federal Government indicted former Virginia Governor Robert McDonnell and his wife, Maureen McDonnell, on bribery charges. The charges related to the acceptance by the McDonnells of $175,000 in loans, gifts, and other benefits from Virginia businessman Jonnie Williams, while Governor McDonnell was in office. Williams was the chief executive officer of Star Scientific, a Virginia-based company that had developed a nutritional supplement made from anatabine, a compound found in tobacco. Star Scientific hoped that Virginia's public universities would perform research studies on anatabine, and Williams wanted Governor McDonnell's assistance in obtaining those studies.

To convict the McDonnells of bribery, the Government was required to show that Governor McDonnell committed (or agreed to commit) an "official act" in exchange for the loans and gifts. The parties did not agree, however, on what counts as an "official act." The Government alleged in the indictment, and maintains on appeal, that Governor

McDonnell committed at least five "official acts." Those acts included "arranging meetings" for Williams with other Virginia officials to discuss Star Scientific's product, "hosting" events for Star Scientific at the Governor's Mansion, and "contacting other government officials" concerning studies of anatabine. Supp. App. 47–48. The Government also argued more broadly that these activities constituted "official action" because they related to Virginia business development, a priority of Governor McDonnell's administration. Governor McDonnell contends that merely setting up a meeting, hosting an event, or contacting an official—without more—does not count as an "official act."

At trial, the District Court instructed the jury according to the Government's broad understanding of what constitutes an "official act," and the jury convicted both Governor and Mrs. McDonnell on the bribery charges. The Fourth Circuit affirmed Governor McDonnell's conviction, and we granted review to clarify the meaning of "official act."

I

A

On November 3, 2009, petitioner Robert McDonnell was elected the 71st Governor of Virginia. His campaign slogan was "Bob's for Jobs," and his focus in office was on promoting business in Virginia. As Governor, McDonnell spoke about economic development in Virginia "on a daily basis" and attended numerous "events, ribbon cuttings," and "plant facility openings." App. 4093, 5241. He also referred thousands of constituents to meetings with members of his staff and other government officials. According to longtime staffers, Governor McDonnell likely had more events at the Virginia Governor's Mansion to promote Virginia business than had occurred in "any other administration." *Id.*, at 4093.

This case concerns Governor McDonnell's interactions with one of his constituents, Virginia businessman Jonnie Williams. Williams was the CEO of Star Scientific, a Virginia-based company that developed and marketed Anatabloc, a nutritional supplement made from anatabine, a compound found in tobacco. Star Scientific hoped to obtain Food and Drug Administration approval of Anatabloc as an anti-inflammatory drug. An important step in securing that approval was initiating independent research studies on the health benefits of anatabine. Star Scientific hoped Virginia's public universities would undertake such studies, pursuant to a grant from Virginia's Tobacco Commission.

Governor McDonnell first met Williams in 2009, when Williams offered McDonnell transportation on his private airplane to assist with McDonnell's election campaign. Shortly after the election, Williams had dinner with Governor and Mrs. McDonnell at a restaurant in New York. The conversation turned to Mrs. McDonnell's search for a dress for the inauguration, which led Williams to offer to purchase a gown for her. Governor McDonnell's counsel later instructed Williams not to buy the dress, and Mrs. McDonnell told Williams that she would take a rain check. *Id.*, at 2203–2209.

In October 2010, Governor McDonnell and Williams met again on Williams's plane. During the flight, Williams told Governor McDonnell that he "needed his help" moving forward on the research studies at Virginia's public universities, and he asked to be introduced to the person that he "needed to talk to." *Id.*, at 2210–2211. Governor McDonnell agreed to introduce Williams to Dr. William Hazel, Virginia's Secretary of Health and Human Resources. Williams met with Dr. Hazel the following month, but the meeting was unfruitful; Dr. Hazel was skeptical of the science behind Anatabloc and did not assist Williams in obtaining the studies. *Id.*, at 2211–

2217, 3738–3749.

Six months later, Governor McDonnell's wife, Maureen McDonnell, offered to seat Williams next to the Governor at a political rally. Shortly before the event, Williams took Mrs. McDonnell on a shopping trip and bought her $20,000 worth of designer clothing. The McDonnells later had Williams over for dinner at the Governor's Mansion, where they discussed research studies on Anatabloc. *Id.*, at 6560.

Two days after that dinner, Williams had an article about Star Scientific's research e-mailed to Mrs. McDonnell, which she forwarded to her husband. Less than an hour later, Governor McDonnell texted his sister to discuss the financial situation of certain rental properties they owned in Virginia Beach. Governor McDonnell also e-mailed his daughter to ask about expenses for her upcoming wedding.

The next day, Williams returned to the Governor's Mansion for a meeting with Mrs. McDonnell. At the meeting, Mrs. McDonnell described the family's financial problems, including their struggling rental properties in Virginia Beach and their daughter's wedding expenses. Mrs. McDonnell, who had experience selling nutritional supplements, told Williams that she had a background in the area and could help him with Anatabloc. According to Williams, she explained that the "Governor says it's okay for me to help you and—but I need you to help me. I need you to help me with this financial situation." *Id.,* at 2231. Mrs. McDonnell then asked Williams for a $50,000 loan, in addition to a $15,000 gift to help pay for her daughter's wedding, and Williams agreed.

Williams testified that he called Governor McDonnell after the meeting and said, "I understand the financial problems and I'm willing to help. I just wanted to make sure that you knew about this." *Id.,* at 2233. According to Williams, Governor McDonnell thanked him for his help.

*Ibid.* Governor McDonnell testified, in contrast, that he did not know about the loan at the time, and that when he learned of it he was upset that Mrs. McDonnell had requested the loan from Williams. *Id.,* at 6095–6096. Three days after the meeting between Williams and Mrs. McDonnell, Governor McDonnell directed his assistant to forward the article on Star Scientific to Dr. Hazel.

In June 2011, Williams sent Mrs. McDonnell's chief of staff a letter containing a proposed research protocol for the Anatabloc studies. The letter was addressed to Governor McDonnell, and it suggested that the Governor "use the attached protocol to initiate the 'Virginia Study' of Anatabloc at the Medical College of Virginia and the University of Virginia School of Medicine." *Id.,* at 2254. Governor McDonnell gave the letter to Dr. Hazel. *Id.,* at 6121–6122. Williams testified at trial that he did not "recall any response" to the letter. *Id.,* at 2256.

In July 2011, the McDonnell family visited Williams's vacation home for the weekend, and Governor McDonnell borrowed Williams's Ferrari while there. Shortly thereafter, Governor McDonnell asked Dr. Hazel to send an aide to a meeting with Williams and Mrs. McDonnell to discuss research studies on Anatabloc. The aide later testified that she did not feel pressured by Governor or Mrs. McDonnell to do "anything other than have the meeting," and that Williams did not ask anything of her at the meeting. *Id.,* at 3075. After the meeting, the aide sent Williams a "polite blow-off" e-mail. *Id.,* at 3081.

At a subsequent meeting at the Governor's Mansion, Mrs. McDonnell admired Williams's Rolex and mentioned that she wanted to get one for Governor McDonnell. Williams asked if Mrs. McDonnell wanted him to purchase a Rolex for the Governor, and Mrs. McDonnell responded, "Yes, that would be nice." *Id.,* at 2274. Williams did so, and Mrs. McDonnell later gave the Rolex to Governor McDonnell as a Christmas present.

In August 2011, the McDonnells hosted a lunch event for Star Scientific at the Governor's Mansion. According to Williams, the purpose of the event was to launch Anatabloc. See *id.*, at 2278. According to Governor McDonnell's gubernatorial counsel, however, it was just lunch. See *id.*, at 3229–3231.

The guest list for the event included researchers at the University of Virginia and Virginia Commonwealth University. During the event, Star Scientific distributed free samples of Anatabloc, in addition to eight $25,000 checks that researchers could use in preparing grant proposals for studying Anatabloc. Governor McDonnell asked researchers at the event whether they thought "there was some scientific validity" to Anatabloc and "whether or not there was any reason to explore this further." *Id.*, at 3344. He also asked whether this could "be something good for the Commonwealth, particularly as it relates to economy or job creation." *Ibid.* When Williams asked Governor McDonnell whether he would support funding for the research studies, Governor McDonnell "very politely" replied, "I have limited decision-making power in this area." *Id.*, at 3927.

In January 2012, Mrs. McDonnell asked Williams for an additional loan for the Virginia Beach rental properties, and Williams agreed. On February 3, Governor McDonnell followed up on that conversation by calling Williams to discuss a $50,000 loan.

Several days later, Williams complained to Mrs. McDonnell that the Virginia universities were not returning Star Scientific's calls. She passed Williams's complaint on to the Governor. While Mrs. McDonnell was driving with Governor McDonnell, she also e-mailed Governor McDonnell's counsel, stating that the Governor "wants to know why nothing has developed" with the research studies after Williams had provided the eight $25,000 checks for preparing grant proposals, and that the

Governor "wants to get this going" at the universities. *Id.*, at 3214, 4931. According to Governor McDonnell, however, Mrs. McDonnell acted without his knowledge or permission, and he never made the statements she attributed to him. *Id.,* at 6306–6308.

On February 16, Governor McDonnell e-mailed Williams to check on the status of documents related to the $50,000 loan. A few minutes later, Governor McDonnell e-mailed his counsel stating, "Please see me about Anatabloc issues at VCU and UVA. Thanks." *Id.*, at 3217. Governor McDonnell's counsel replied, "Will do. We need to be careful with this issue." *Ibid.* The next day, Governor McDonnell's counsel called Star Scientific's lobbyist in order to "change the expectations" of Star Scientific regarding the involvement of the Governor's Office in the studies. *Id.*, at 3219.

At the end of February, Governor McDonnell hosted a healthcare industry reception at the Governor's Mansion, which Williams attended. Mrs. McDonnell also invited a number of guests recommended by Williams, including researchers at the Virginia universities. Governor McDonnell was present, but did not mention Star Scientific, Williams, or Anatabloc during the event. *Id.*, at 3671–3672. That same day, Governor McDonnell and Williams spoke about the $50,000 loan, and Williams loaned the money to the McDonnells shortly thereafter. *Id.,* at 2306, 2353.

In March 2012, Governor McDonnell met with Lisa Hicks-Thomas, the Virginia Secretary of Administration, and Sara Wilson, the Director of the Virginia Department of Human Resource Management. The purpose of the meeting was to discuss Virginia's health plan for state employees. At that time, Governor McDonnell was taking Anatabloc several times a day. He took a pill during the meeting, and told Hicks-Thomas and Wilson that the pills "were working well for him" and "would be good for" state

employees. *Id.*, at 4227. Hicks-Thomas recalled Governor McDonnell asking them to meet with a representative from Star Scientific; Wilson had no such recollection. *Id.*, at 4219, 4227. After the discussion with Governor McDonnell, Hicks-Thomas and Wilson looked up Anatabloc on the Internet, but they did not set up a meeting with Star Scientific or conduct any other follow-up. *Id.*, at 4220, 4230. It is undisputed that Virginia's health plan for state employees does not cover nutritional supplements such as Anatabloc.

In May 2012, Governor McDonnell requested an additional $20,000 loan, which Williams provided. Throughout this period, Williams also paid for several rounds of golf for Governor McDonnell and his children, took the McDonnells on a weekend trip, and gave $10,000 as a wedding gift to one of the McDonnells' daughters. In total, Williams gave the McDonnells over $175,000 in gifts and loans.

B

In January 2014, Governor McDonnell was indicted for accepting payments, loans, gifts, and other things of value from Williams and Star Scientific in exchange for "performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products." Supp. App. 46. The charges against him comprised one count of conspiracy to commit honest services fraud, three counts of honest services fraud, one count of conspiracy to commit Hobbs Act extortion, six counts of Hobbs Act extortion, and two counts of making a false statement. See 18 U. S. C. §§1343, 1349 (honest services fraud); §1951(a) (Hobbs Act extortion); §1014 (false statement). Mrs. McDonnell was indicted on similar charges, plus obstructing official proceedings, based on her alleged involvement in the scheme. See §1512(c)(2) (obstruction).

The theory underlying both the honest services fraud and Hobbs Act extortion charges was that Governor McDonnell had accepted bribes from Williams. See *Skilling* v. *United States*, 561 U. S. 358, 404 (2010) (construing honest services fraud to forbid "fraudulent schemes to deprive another of honest services through bribes or kickbacks"); *Evans* v. *United States*, 504 U. S. 255, 260, 269 (1992) (construing Hobbs Act extortion to include "'taking a bribe'").

The parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U. S. C. §201. That statute makes it a crime for "a public official or person selected to be a public official, directly or indirectly, corruptly" to demand, seek, receive, accept, or agree "to receive or accept anything of value" in return for being "influenced in the performance of any official act." §201(b)(2). An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." §201(a)(3).

The parties also agreed that obtaining a "thing of value . . . knowing that the thing of value was given in return for official action" was an element of Hobbs Act extortion, and that they would use the definition of "official act" found in the federal bribery statute to define "official action" under the Hobbs Act. 792 F. 3d 478, 505 (CA4 2015) (internal quotation marks omitted).

As a result of all this, the Government was required to prove that Governor McDonnell committed or agreed to commit an "official act" in exchange for the loans and gifts from Williams. See *Evans*, 504 U. S., at 268 ("the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an ele-

ment of the offense").

The Government alleged that Governor McDonnell had committed at least five "official acts":

> (1) "arranging meetings for [Williams] with Virginia government officials, who were subordinates of the Governor, to discuss and promote Anatabloc";
>
> (2) "hosting, and . . . attending, events at the Governor's Mansion designed to encourage Virginia university researchers to initiate studies of anatabine and to promote Star Scientific's products to doctors for referral to their patients";
>
> (3) "contacting other government officials in the [Governor's Office] as part of an effort to encourage Virginia state research universities to initiate studies of anatabine";
>
> (4) "promoting Star Scientific's products and facilitating its relationships with Virginia government officials by allowing [Williams] to invite individuals important to Star Scientific's business to exclusive events at the Governor's Mansion"; and
>
> (5) "recommending that senior government officials in the [Governor's Office] meet with Star Scientific executives to discuss ways that the company's products could lower healthcare costs."  Supp. App. 47–48 (indictment).

The case proceeded to a jury trial, which lasted five weeks.  Pursuant to an immunity agreement, Williams testified that he had given the gifts and loans to the McDonnells to obtain the Governor's "help with the testing" of Anatabloc at Virginia's medical schools.  App. 2234. Governor McDonnell acknowledged that he had requested loans and accepted gifts from Williams.  He testified, however, that setting up meetings with government offi-

cials was something he did "literally thousands of times" as Governor, and that he did not expect his staff "to do anything other than to meet" with Williams. *Id.*, at 6042.

Several state officials testified that they had discussed Anatabloc with Williams or Governor McDonnell, but had not taken any action to further the research studies. *Id.*, at 3739–3750 (Dr. Hazel), 3075–3077 (aide to Dr. Hazel), 4218–4220 (Sara Wilson), 4230–4231 (Lisa Hicks-Thomas). A UVA employee in the university research office, who had never spoken with the Governor about Anatabloc, testified that she wrote a pro/con list concerning research studies on Anatabloc. The first "pro" was the "[p]erception to Governor that UVA would like to work with local companies," and the first "con" was the "[p]olitical pressure from Governor and impact on future UVA requests from the Governor." *Id.*, at 4321, 4323 (Sharon Krueger).

Following closing arguments, the District Court instructed the jury that to convict Governor McDonnell it must find that he agreed "to accept a thing of value in exchange for official action." Supp. App. 68. The court described the five alleged "official acts" set forth in the indictment, which involved arranging meetings, hosting events, and contacting other government officials. The court then quoted the statutory definition of "official act," and—as the Government had requested—advised the jury that the term encompassed "acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id.*, at 69–70.

Governor McDonnell had requested the court to further instruct the jury that the "fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an 'official act,'" and that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,'

even if they are settled practices of the official," because they "are not decisions on matters pending before the government." 792 F. 3d, at 513 (internal quotation marks omitted). He also asked the court to explain to the jury that an "official act" must intend to or "in fact influence a specific official decision the government actually makes— such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation." App. to Pet. for Cert. 147a. The District Court declined to give Governor McDonnell's proposed instruction to the jury.

The jury convicted Governor McDonnell on the honest services fraud and Hobbs Act extortion charges, but acquitted him on the false statement charges. Mrs. McDonnell was also convicted on most of the charges against her. Although the Government requested a sentence of at least ten years for Governor McDonnell, the District Court sentenced him to two years in prison. Mrs. McDonnell received a one-year sentence.

Following the verdict, Governor McDonnell moved to vacate his convictions on the ground that the jury instructions "were legally erroneous because they (i) allowed the jury to convict [him] on an erroneous understanding of 'official act,' and (ii) allowed a conviction on the theory that [he] accepted things of value that were given for future unspecified action." 64 F. Supp. 3d 783, 787 (ED Va. 2014). The District Court denied the motion. *Id.,* at 802. In addition, Governor McDonnell moved for acquittal on the basis that there was insufficient evidence to convict him, and that the Hobbs Act and honest services statute were unconstitutionally vague. Crim. No. 3:14–CR–12 (ED Va., Dec. 1, 2014), Supp. App. 80, 82–92. That motion was also denied. See *id.,* at 92–94. (He also raised other challenges to his convictions, which are not at issue here.)

Governor McDonnell appealed his convictions to the Fourth Circuit, challenging the definition of "official ac-

tion" in the jury instructions on the ground that it deemed "virtually all of a public servant's activities 'official,' no matter how minor or innocuous." 792 F. 3d, at 506. He also reiterated his challenges to the sufficiency of the evidence and the constitutionality of the statutes under which he was convicted. *Id.*, at 509, n. 19, 515.

The Fourth Circuit affirmed, and we granted certiorari. 577 U. S. \_\_\_ (2016). Mrs. McDonnell's separate appeal remains pending before the Court of Appeals.

## II

The issue in this case is the proper interpretation of the term "official act." Section 201(a)(3) defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

According to the Government, "Congress used intentionally broad language" in §201(a)(3) to embrace "*any* decision or action, on *any* question or matter, that may at *any time* be pending, or which may by law be brought before *any* public official, in such official's official capacity." Brief for United States 20–21 (Government's emphasis; alteration and internal quotation marks omitted). The Government concludes that the term "official act" therefore encompasses nearly any activity by a public official. In the Government's view, "official act" specifically includes arranging a meeting, contacting another public official, or hosting an event—without more—concerning any subject, including a broad policy issue such as Virginia economic development. *Id.,* at 47–49; Tr. of Oral Arg. 28–30.

Governor McDonnell, in contrast, contends that statutory context compels a more circumscribed reading, limiting "official acts" to those acts that "direct[] a particular reso-

lution of a specific governmental decision," or that pressure another official to do so. Brief for Petitioner 44, 51. He also claims that "vague corruption laws" such as §201 implicate serious constitutional concerns, militating "in favor of a narrow, cautious reading of these criminal statutes." *Id.,* at 21.

Taking into account the text of the statute, the precedent of this Court, and the constitutional concerns raised by Governor McDonnell, we reject the Government's reading of §201(a)(3) and adopt a more bounded interpretation of "official act." Under that interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an "official act."

A

The text of §201(a)(3) sets forth two requirements for an "official act": First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so. The issue here is whether arranging a meeting, contacting another official, or hosting an event—without more—can be a "question, matter, cause, suit, proceeding or controversy," and if not, whether it can be a decision or action on a "question, matter, cause, suit, proceeding or controversy."

The first inquiry is whether a typical meeting, call, or event is itself a "question, matter, cause, suit, proceeding or controversy." The Government argues that nearly any activity by a public official qualifies as a question or matter—from workaday functions, such as the typical call, meeting, or event, to the broadest issues the government confronts, such as fostering economic development. We conclude, however, that the terms "question, matter,

cause, suit, proceeding or controversy" do not sweep so broadly.

The last four words in that list—"cause," "suit," "proceeding," and "controversy"—connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination.  See, *e.g.,* Crimes Act of 1790, §21, 1 Stat. 117 (using "cause," "suit," and "controversy" in a related statutory context to refer to judicial proceedings); Black's Law Dictionary 278–279, 400, 1602–1603 (4th ed. 1951) (defining "cause," "suit," and "controversy" as judicial proceedings); 18 U. S. C. §201(b)(3) (using "proceeding" to refer to trials, hearings, or the like "before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer").  Although it may be difficult to define the precise reach of those terms, it seems clear that a typical meeting, telephone call, or event arranged by a public official does not qualify as a "cause, suit, proceeding or controversy."

But what about a "question" or "matter"?  A "question" could mean any "subject or aspect that is in dispute, open for discussion, or to be inquired into," and a "matter" any "subject" of "interest or relevance."  Webster's Third New International Dictionary 1394, 1863 (1961).  If those meanings were adopted, a typical meeting, call, or event would qualify as a "question" or "matter."  A "question" may also be interpreted more narrowly, however, as "a subject or point of debate or a proposition being or to be voted on in a meeting," such as a question "before the senate."  *Id.,* at 1863.  Similarly, a "matter" may be limited to "a topic under active and usually serious or practical consideration," such as a matter that "will come before the committee."  *Id.,* at 1394.

To choose between those competing definitions, we look to the context in which the words appear.  Under the familiar interpretive canon *noscitur a sociis*, "a word is known by the company it keeps."  *Jarecki* v. *G. D. Searle &*

*Co.*, 367 U. S. 303, 307 (1961). While "not an inescapable rule," this canon "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Ibid.* For example, in *Gustafson* v. *Alloyd Co.*, 513 U. S. 561 (1995), a statute defined the word "prospectus" as a "prospectus, notice, circular, advertisement, letter, or communication." *Id.,* at 573–574 (internal quotation marks omitted). We held that although the word "communication" could in the abstract mean any type of communication, "it is apparent that the list refers to documents of wide dissemination," and that inclusion "of the term 'communication' in that list suggests that it too refers to a public communication." *Id.,* at 575.

Applying that same approach here, we conclude that a "question" or "matter" must be similar in nature to a "cause, suit, proceeding or controversy." Because a typical meeting, call, or event arranged by a public official is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not qualify as a "question" or "matter" under §201(a)(3).

That more limited reading also comports with the presumption "that statutory language is not superfluous." *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 299, n. 1 (2006). If "question" and "matter" were as unlimited in scope as the Government argues, the terms "cause, suit, proceeding or controversy" would serve no role in the statute—every "cause, suit, proceeding or controversy" would also be a "question" or "matter." Under a more confined interpretation, however, "question" and "matter" may be understood to refer to a formal exercise of governmental power that is similar in nature to a "cause, suit, proceeding or controversy," but that does not necessarily fall into one of those prescribed categories.

Because a typical meeting, call, or event is not itself a

question or matter, the next step is to determine whether arranging a meeting, contacting another official, or hosting an event may qualify as a "decision or action" *on* a different question or matter. That requires us to first establish what counts as a question or matter in this case.

In addition to the requirements we have described, §201(a)(3) states that the question or matter must be "pending" or "may by law be brought" before "any public official." "Pending" and "may by law be brought" suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, "may *by law* be brought" conveys something within the specific duties of an official's position—the function conferred by the authority of his office. The word "any" conveys that the matter may be pending either before the public official who is performing the official act, or before another public official.

The District Court, however, determined that the relevant matter in this case could be considered at a much higher level of generality as "Virginia business and economic development," or—as it was often put to the jury— "Bob's for Jobs." Supp. App. 88; see, *e.g.,* App. 1775, 2858, 2912, 3733. Economic development is not naturally described as a matter "pending" before a public official—or something that may be brought "by law" before him—any more than "justice" is pending or may be brought by law before a judge, or "national security" is pending or may be brought by law before an officer of the Armed Forces. Under §201(a)(3), the pertinent "question, matter, cause, suit, proceeding or controversy" must be more focused and concrete.

For its part, the Fourth Circuit found at least three questions or matters at issue in this case: (1) "whether researchers at any of Virginia's state universities would initiate a study of Anatabloc"; (2) "whether the state-

created Tobacco Indemnification and Community Revitalization Commission" would "allocate grant money for the study of anatabine"; and (3) "whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug." 792 F. 3d, at 515–516. We agree that those qualify as questions or matters under §201(a)(3). Each is focused and concrete, and each involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing.

The question remains whether—as the Government argues—merely setting up a meeting, hosting an event, or calling another official qualifies as a decision or action on any of those three questions or matters. Although the word "decision," and especially the word "action," could be read expansively to support the Government's view, our opinion in *United States* v. *Sun-Diamond Growers of Cal.*, 526 U. S. 398 (1999), rejects that interpretation.

In *Sun-Diamond*, the Court stated that it was not an "official act" under §201 for the President to host a championship sports team at the White House, the Secretary of Education to visit a high school, or the Secretary of Agriculture to deliver a speech to "farmers concerning various matters of USDA policy." *Id.*, at 407. We recognized that "the Secretary of Agriculture *always* has before him or in prospect matters that affect farmers, just as the President always has before him or in prospect matters that affect college and professional sports, and the Secretary of Education matters that affect high schools." *Ibid.* But we concluded that the existence of such pending matters was not enough to find that any action related to them constituted an "official act." *Ibid.* It was possible to avoid the "absurdities" of convicting individuals on corruption charges for engaging in such conduct, we explained, "*through the definition of that term,*" *i.e.*, by adopting a more limited definition of "official acts." *Id.,* at 408.

It is apparent from *Sun-Diamond* that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a "decision or action" within the meaning of §201(a)(3), even if the event, meeting, or speech is related to a pending question or matter. Instead, something more is required: §201(a)(3) specifies that the public official must make a decision or take an action *on* that question or matter, or agree to do so.

For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics— would qualify as an "official act." A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on *another* official to perform an "official act." In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of §201(a)(3). See *United States* v. *Birdsall*, 233 U. S. 223, 234 (1914) (finding "official action" on the part of subordinates where their superiors "would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with" the "facts and circumstances of particular cases").

Under this Court's precedents, a public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that the official agree to do so. See *Evans*, 504 U. S., at 268. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the "official act," so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that

the public official received a thing of value knowing that it was given with the expectation that the official would perform an "official act" in return. See *ibid.* It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an "official act" at the time of the alleged *quid pro quo.* The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question.

Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information, however, does not qualify as a decision or action on the pending question of whether to initiate the study. Simply expressing support for the research study at a meeting, event, or call—or sending a subordinate to such a meeting, event, or call—similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an "official act." Otherwise, if every action somehow related to the research study were an "official act," the requirement that the public official make a decision or take an action on that study, or agree to do so, would be meaningless.

Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

The Government relies on this Court's decision in *Bird-*

*sall* to support a more expansive interpretation of "official act," but *Birdsall* is fully consistent with our reading of §201(a)(3). We held in *Birdsall* that "official action" could be established by custom rather than "by statute" or "a written rule or regulation," and need not be a formal part of an official's decisionmaking process. 233 U. S*., at 230–231. That does not mean, however, that every decision or action customarily performed by a public official—such as the myriad decisions to refer a constituent to another official—counts as an "official act." The "official action" at issue in *Birdsall* was "advis[ing] the Commissioner of Indian Affairs, contrary to the truth," that the facts of the case warranted granting leniency to certain defendants convicted of "unlawfully selling liquor to Indians." *Id.,* at 227–230. That "decision or action" fits neatly within our understanding of §201(a)(3): It reflected a decision or action to advise another official *on* the pending question whether to grant leniency.

In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit

that definition of "official act."

B

In addition to being inconsistent with both text and precedent, the Government's expansive interpretation of "official act" would raise significant constitutional concerns. Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an "official act." In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event— counts as a *quo*. See Brief for United States 14, 27; Tr. of Oral Arg. 34–35, 44–46.

But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ballgame. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

This concern is substantial. White House counsel who worked in every administration from that of President Reagan to President Obama warn that the Government's "breathtaking expansion of public-corruption law would likely chill federal officials' interactions with the people

they serve and thus damage their ability effectively to perform their duties." Brief for Former Federal Officials as *Amici Curiae* 6. Six former Virginia attorneys general—four Democrats and two Republicans—also filed an *amicus* brief in this Court echoing those concerns, as did 77 former state attorneys general from States other than Virginia—41 Democrats, 35 Republicans, and 1 independent. Brief for Former Virginia Attorneys General as *Amici Curiae* 1–2, 16; Brief for 77 Former State Attorneys General (Non-Virginia) as *Amici Curiae* 1–2.

None of this, of course, is to suggest that the facts of this case typify normal political interaction between public officials and their constituents. Far from it. But the Government's legal interpretation is not confined to cases involving extravagant gifts or large sums of money, and we cannot construe a criminal statute on the assumption that the Government will "use it responsibly." *United States* v. *Stevens*, 559 U. S. 460, 480 (2010). The Court in *Sun-Diamond* declined to rely on "the Government's discretion" to protect against overzealous prosecutions under §201, concluding instead that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." 526 U. S., at 408, 412.

A related concern is that, under the Government's interpretation, the term "official act" is not defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U. S., at 402–403 (internal quotation marks omitted). Under the "'standardless sweep'" of the Government's reading, *Kolender* v. *Lawson*, 461 U. S. 352, 358 (1983), public officials could be subject to prosecution, without fair notice, for the most prosaic interactions. "Invoking so shapeless a provision to condemn someone to prison" for up to 15 years raises the serious concern that

the provision "does not comport with the Constitution's guarantee of due process." *Johnson* v. *United States*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 10). Our more constrained interpretation of §201(a)(3) avoids this "vagueness shoal." *Skilling*, 561 U. S., at 368.

The Government's position also raises significant federalism concerns. A State defines itself as a sovereign through "the structure of its government, and the character of those who exercise government authority." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991). That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents. Here, where a more limited interpretation of "official act" is supported by both text and precedent, we decline to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards" of "good government for local and state officials." *McNally* v. *United States*, 483 U. S. 350, 360 (1987); see also *United States* v. *Enmons*, 410 U. S. 396, 410–411 (1973) (rejecting a "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States").

## III

### A

Governor McDonnell argues that his convictions must be vacated because the jury was improperly instructed on the meaning of "official act" under §201(a)(3) of the federal bribery statute. According to Governor McDonnell, the District Court "refused to convey any meaningful limits on 'official act,' giving an instruction that allowed the jury to convict [him] for lawful conduct." Brief for Petitioner 51. We agree.

The jury instructions included the statutory definition of "official action," and further defined the term to include "actions that have been clearly established by settled

practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law." Supp. App. 69–70. The instructions also stated that "official actions may include acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id.*, at 70. In light of our interpretation of the term "official acts," those instructions lacked important qualifications, rendering them significantly overinclusive.

First, the instructions did not adequately explain to the jury how to identify the "question, matter, cause, suit, proceeding or controversy." As noted, the Fourth Circuit held that "the Government presented evidence of three questions or matters": (1) "whether researchers at any of Virginia's state universities would initiate a study of Anatabloc"; (2) "whether the state-created Tobacco Indemnification and Community Revitalization Commission" would "allocate grant money for the study of anatabine"; and (3) "whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug." 792 F. 3d, at 515–516.

The problem with the District Court's instructions is that they provided no assurance that the jury reached its verdict after finding those questions or matters. The testimony at trial described how Governor McDonnell set up meetings, contacted other officials, and hosted events. It is possible the jury thought that a typical meeting, call, or event was itself a "question, matter, cause, suit, proceeding or controversy." If so, the jury could have convicted Governor McDonnell without finding that he committed or agreed to commit an "official act," as properly defined. To prevent this problem, the District Court should have instructed the jury that it must identify a "question, matter, cause, suit, proceeding or controversy" involving the formal exercise of governmental power.

Second, the instructions did not inform the jury that the "question, matter, cause, suit, proceeding or controversy" must be more specific and focused than a broad policy objective. The Government told the jury in its closing argument that "[w]hatever it was" Governor McDonnell had done, "it's all official action." App. to Pet. for Cert. 263a–264a. Based on that remark, and the repeated references to "Bob's for Jobs" at trial, the jury could have thought that the relevant "question, matter, cause, suit, proceeding or controversy" was something as nebulous as "Virginia business and economic development," as the District Court itself concluded. Supp. App. 87–88 ("The alleged official actions in this case were within the range of actions on questions, matters, or causes pending before McDonnell as Governor as multiple witnesses testified that Virginia business and economic development was a top priority in McDonnell's administration"). To avoid that misconception, the District Court should have instructed the jury that the pertinent "question, matter, cause, suit, proceeding or controversy" must be something specific and focused that is "pending" or "may by law be brought before any public official," such as the question whether to initiate the research studies.

Third, the District Court did not instruct the jury that to convict Governor McDonnell, it had to find that he made a decision or took an action—or agreed to do so—*on* the identified "question, matter, cause, suit, proceeding or controversy," as we have construed that requirement. At trial, several of Governor McDonnell's subordinates testified that he asked them to attend a meeting, not that he expected them to do anything other than that. See, *e.g.,* App. 3075, 3739–3740, 4220. If that testimony reflects what Governor McDonnell agreed to do at the time he accepted the loans and gifts from Williams, then he did not agree to make a decision or take an action on any of the three questions or matters described by the Fourth

Circuit.

The jury may have disbelieved that testimony or found other evidence that Governor McDonnell agreed to exert pressure on those officials to initiate the research studies or add Anatabloc to the state health plan, but it is also possible that the jury convicted Governor McDonnell without finding that he agreed to make a decision or take an action on a properly defined "question, matter, cause, suit, proceeding or controversy." To forestall that possibility, the District Court should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter.

Because the jury was not correctly instructed on the meaning of "official act," it may have convicted Governor McDonnell for conduct that is not unlawful. For that reason, we cannot conclude that the errors in the jury instructions were "harmless beyond a reasonable doubt." *Neder* v. *United States*, 527 U. S. 1, 16 (1999) (internal quotation marks omitted). We accordingly vacate Governor McDonnell's convictions.

B

Governor McDonnell raises two additional claims. First, he argues that the charges against him must be dismissed because the honest services statute and the Hobbs Act are unconstitutionally vague. See Brief for Petitioner 58–61. We reject that claim. For purposes of this case, the parties defined honest services fraud and Hobbs Act extortion with reference to §201 of the federal bribery statute. Because we have interpreted the term "official act" in §201(a)(3) in a way that avoids the vagueness concerns raised by Governor McDonnell, we decline to invalidate those statutes under the facts here. See *Skilling*, 561 U. S., at 403 (seeking "to construe, not condemn, Congress' enactments").

Second, Governor McDonnell argues that the charges must be dismissed because there is insufficient evidence that he committed an "official act," or that he agreed to do so. Brief for Petitioner 44–45. Because the parties have not had an opportunity to address that question in light of the interpretation of §201(a)(3) adopted by this Court, we leave it for the Court of Appeals to resolve in the first instance. If the court below determines that there is sufficient evidence for a jury to convict Governor McDonnell of committing or agreeing to commit an "official act," his case may be set for a new trial. If the court instead determines that the evidence is insufficient, the charges against him must be dismissed. We express no view on that question.

*     *     *

There is no doubt that this case is distasteful; it may be worse than that. But our concern is not with tawdry tales of Ferraris, Rolexes, and ball gowns. It is instead with the broader legal implications of the Government's boundless interpretation of the federal bribery statute. A more limited interpretation of the term "official act" leaves ample room for prosecuting corruption, while comporting with the text of the statute and the precedent of this Court.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*