# United States Court of Appeals
## For the First Circuit

Nos. 14-2313,
     14-2314,
     14-2315

UNITED STATES OF AMERICA,

Appellee,

v.

ELIZABETH V. TAVARES,
JOHN J. O'BRIEN, and
WILLIAM H. BURKE, III,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Martin G. Weinberg, with whom Kimberly Homan, were on brief, for appellant Tavares.
Judith H. Mizner, Assistant Federal Public Defender, for appellant O'Brien.
John A. Amabile, with whom James Bradbury and Amabile & Burkly, P.C., were on brief, for appellant Burke, III.
Stephan E. Oestreicher, Jr., Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy

Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Fred M. Wyshak, Jr. and Karin M. Bell, both Assistant United States Attorneys, were on brief, for appellee.

---

December 19, 2016

---

**TORRUELLA**, **Circuit Judge**. Defendants-appellants John O'Brien, Elizabeth Tavares, and William Burke appeal their convictions for Racketeer Influenced and Corrupt Organizations ("RICO") violations, 18 U.S.C. § 1962(c), RICO conspiracy, 18 U.S.C. § 1962(d), and mail fraud, 18 U.S.C. § 1341, based on their roles in a hiring scheme at the Massachusetts Office of the Commissioner of Probation ("OCP") from 2000 to 2010. O'Brien, Tavares, and Burke previously served as high-ranking officials in the OCP. There, they catered to hiring requests from members of the state legislature with the hope of obtaining favorable legislation for the Department of Probation and the OCP. Although the actions of the defendants may well be judged distasteful, and even contrary to Massachusetts's personnel laws, the function of this Court is limited to determining whether they violated the federal criminal statutes charged. We find that the Government overstepped its bounds in using federal criminal statutes to police the hiring practices of these Massachusetts state officials and did not provide sufficient evidence to establish a criminal violation of Massachusetts law under the Government's theory of the case. We reverse.

## I.

We provide a summary of the most salient facts as the jury might have found them.

-3-

Many of the defendants' claims of error are predicated on the sufficiency of the evidence, for which we must evaluate the evidence "in the light most favorable to the verdict" and determine whether the "evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Manso-Cepeda, 810 F.3d 846, 849 (1st Cir. 2016) (quoting United States v. Santos-Rivera, 726 F.3d 17, 23 (1st Cir. 2013)).

A.  **The OCP and the Hiring Framework**

O'Brien, Tavares, and Burke worked in the OCP, which serves as the central office of the Massachusetts Probation Department and employs the Commissioner of Probation, deputy commissioners, and regional supervisors, also known as regional administrators.  The OCP is responsible for staffing approximately 1,600 employees in about 100 probation offices throughout Massachusetts.  O'Brien served as the Commissioner of Probation (the "Commissioner"), the highest-ranking position within the Department of Probation, from 1998 to 2010, and he was responsible for appointing all employees.  Tavares served as second deputy commissioner from 2000 to 2008 and first deputy commissioner from 2008 to 2010, and Burke was the deputy commissioner of Western Massachusetts from 1998 to 2009.

Prior to 2001, local judges had authority to appoint and promote probation employees, subject to the approval of the Chief Justice of Administration and Management ("CJAM"). In 2001, new legislation gave the Commissioner the "exclusive authority" for probation hiring and promotion, although his appointments were still subject to the approval of the CJAM. The CJAM's hiring policies for the trial court were promulgated in the Personnel Policies and Procedures Manual (the "Manual"), copies of which were kept at OCP and distributed to chief probation officers. Among other things, the Manual provided that "the objective of the hiring process is to select the most qualified individuals who can carry out their responsibilities in a competent and professional manner." Judge Robert Mulligan served as the CJAM throughout most of the relevant parts of this case, beginning in 2003.

The Manual also set out certain procedures for making permanent hires. In practice, openings in the Probation Department were posted on the Massachusetts trial court website, and candidates submitted applications and resumes to the Probation Department. The applications were collected at the OCP, where Janet Mucci, supervisor of the Human Resources department, screened them for minimum education and experience requirements. To further winnow the applicant pool, from 2005 onward the OCP had

applicants attend a screening interview with a regional administrator.

Each applicant who passed the screening round proceeded to a second-round interview before a three-member panel consisting of a chief probation officer, local judge, and regional administrator. Every candidate was asked the same set of questions, and each panel member would rank his or her top eight candidates. The second round of interviews was consistent with the Manual's procedures, which called for "an interview committee consisting of the Commissioner . . . or his/her designee, the Chief Probation Officer of the Division, and a representative of the [CJAM]" to interview probation applicants. In addition, the Manual directed O'Brien to "develop a standard set of questions" which, "[a]t a minimum, each applicant should be asked" if interviewed.

The regional administrator received a scoring sheet for each candidate to tally the scores of the three-member panel. The top eight candidates proceeded to a final-round interview at the OCP before two members of probation, typically two of deputy commissioner Francis Wall, deputy commissioner Patricia Walsh, and OCP Administrative Attorney Edward McDermott. O'Brien set up the third round of interviews, which was not prescribed by the Manual.

Once the Commissioner selected the final candidate or candidates after the third-round interview, their application

packages were prepared and sent to the CJAM, who typically gave his signature for final approval. The appointment documentation form specified which records were included within each package:

> In accordance with the established personnel standards, enclosed are:
> The Applicant Interview and Hiring Record
> The Applicant Flow Record
> A copy of all applications of the candidates who were interviewed
> A copy of the notice of vacancy (job posting)
> The Jobs Hotline Confirmation letter (F 3) (if on the Hotline)
> The Employment Eligibility Verification Form 19 (F 16) & supporting documentation (new hires only)
> The SSA-1945 Statement Concerning Employment in a Job not covered by Social Security (F 30) (new hires only)
> The Consent to Criminal Record Check (F 23) (new hires only)
> The Application for Allied Service Credit (F 26) (Probation Officer positions only).

For each appointment, the Commissioner would "certify that [he had] complied with the Trial Court's personnel standards and that sufficient funding exists in the current fiscal budget to support this position."

## B. The Hiring Scheme

The defendants abused the hiring process to ensure that favored candidates were promoted or appointed in exchange for favorable budget treatment from the state legislature and increased control over the Probation Department. O'Brien told

-7-

Wall, his close friend, that the patronage hiring scheme ensured that he had "a good rapport with the legislature" to facilitate "a beneficial budget to the Probation Department." During each round of the interview process, various members of the Probation Department ensured that individuals recommended by legislators and other high-ranking officials secured their desired positions. As a result, the Probation Department was "the beneficiary of better budgets." The OCP regularly received referrals from legislators by mail and phone, and the names and their recommenders were compiled in "sponsor lists" sent to O'Brien. Throughout the hiring process, O'Brien would meet with members of his staff responsible for receiving referrals and maintaining the sponsor lists to discuss which candidates had been referred by whom and for what positions.

Before the second-round interviews, Tavares and others would give regional administrators assigned to the three-member panel names of candidates that should be passed on to the third round. The regional administrators typically would pass these names to the chief probation officer assigned to the panel but did not always inform the local judge on the panel. The regional administrators and chief probation officers understood that these individuals were to be given priority to ensure they proceeded to the next round: one regional administrator testified that he

"inflate[d]" their ratings, and a chief probation officer explained that the lists "influence[d]" his ranking of the individuals.

Some of the regional administrators and chief probation officers involved in the hiring process took issue with these practices. Ellen Slaney, who served as a regional administrator, understood that these individuals had "sponsors that were politically influential," and -- when she explained to Tavares that some of the best applicants were being passed over -- Tavares replied "that sometimes the political thing had to be done." Edward Driscoll, who was a chief probation officer and then a regional administrator during the relevant time period, testified that he began using pens rather than pencils when he scored interviewees, as he suspected that his scores were being changed to ensure preferred candidates proceeded to the next round. Driscoll recalled a conversation with Burke in 2006: Driscoll expressed concern that a candidate whose husband was a local sheriff had been "fast-tracked," to which Burke replied, "Everything's going [to] be fine," and "I wrote the book on this stuff."

When members of the second-round panel failed to pass along the selected names, they at times faced retaliation from O'Brien and his staff: Slaney recalled an instance in January

2001 where O'Brien called her into his office and appeared "upset with [her]" after she did not include a particular individual on the list for a third-round interview. When she explained her reasons for not advancing the individual, O'Brien replied "Oh, come on, Ellen, everybody has a sponsor." In 2005, after Slaney declined to advance a recommended candidate, she was assigned to work on "overdue audits," clerical work that Slaney perceived as "retaliation for not participating in the hiring process . . . [i]n a way that I was told that I should."

Although the Manual did not provide for third-round interviews, O'Brien implemented the final round to "ensure that the candidates that he selected would be presented to him as the candidate for the position." During the third round, the same four or five questions, all of which Tavares prepared, were posed to each candidate. Prior to the interviews, Wall would receive a list of names and how they should be ranked from O'Brien, Tavares, or Edward Ryan, a legislative liaison for the OCP. O'Brien received these names from legislators, judges, and attorneys who would call or mail O'Brien referrals. Wall testified that "it was my responsibility . . . to make sure that those candidates were ranked in the order given to me." To ensure the candidates were ranked according to O'Brien's instructions, the interview panel would "help, would change scores, would embellish, . . . pretty

-10-

much do anything that was necessary to ensure that they were the Number 1 candidate." Prior to interviews in Western Massachusetts, Wall would meet with Burke to "advise him . . . who the Commissioner advised would be the candidate and what number rank they would be given."

Once the preferred candidate was chosen, OCP staff would send the application package and certification to Judge Mulligan. O'Brien was responsible for signing off on the certification, and he often certified that the "best qualified" candidate had been chosen. The OCP would then send out rejection letters to unsuccessful candidates stamped with O'Brien's or Tavares's signature.

Judge Mulligan understood that he had the authority to "approve the appointment or to reject the appointment," but that he could not "substitute [his] judgment as to who the best person would be." Judge Mulligan also understood that the appointment should be "consistent with the . . . Manual" and that the certification indicated that the appointment was consistent with a "merit-based hiring system."

Judge Mulligan and O'Brien had a contentious relationship, which Judge Mulligan described as "oppositional almost from the time I took office." Sometime in 2006, Judge Mulligan grew suspicious of O'Brien's appointments and asked his

"HR department to red-flag any cases that they thought were unusual." In particular, he grew concerned that the scores of the final interview panel were taking precedence over the scores of the second-round, local panel, and informed O'Brien that he did "not believe that this selection process [would] lead to the most qualified candidate since it seem[ed] designed to ignore the assessments of the local panel and [gave] short-shrift to important background characteristics of the candidates." After Judge Mulligan spoke to a deputy commissioner about one of O'Brien's appointments, the Senate Chair of the Ways and Means Committee, Senator Steven C. Panagiotakos, told Judge Mulligan that he had only "limited authority" to review O'Brien's appointments. After this conversation, Judge Mulligan "back[ed] off somewhat in [his] review of Mr. O'Brien's choices for positions."

In 2010, the Boston Globe Spotlight Team released an in-depth report highlighting the hiring practices in the Probation Department: "After 12 years in charge, Jack O'Brien has transformed the Probation Department from a national pioneer of better ways to rehabilitate criminals into an organization that functions more like a private employment agency for the well connected . . . ." Scott Allen, Agency Where Patronage Is Job

One, Bos. Globe, May 23, 2010.  The day after the article was released, Judge Mulligan suspended O'Brien.[1]

**C.  Procedural History**

A federal indictment in the United States District Court for the District of Massachusetts followed in 2012.  The second superseding indictment alleged that, from 2000 to 2010, the defendants implemented a sham merit-based hiring system and that O'Brien "falsely certified to the CJAM that the candidate for employment had been hired pursuant to the procedures mandated by the Manual," that is to say, a merit-based hiring system.  The indictment charged Count One for RICO conspiracy under 18 U.S.C. § 1962(d) as to all three defendants, Count Two for substantive RICO violations under 18 U.S.C. § 1962(c) as to O'Brien and Tavares, and Counts Three through Twelve for mail fraud under 18 U.S.C. § 1341 and § 2 as to all three defendants.  The substantive RICO count was based on the predicate acts of mail fraud and

---

[1]  The Massachusetts Supreme Judicial Court subsequently appointed an Independent Counsel to investigate the OCP's hiring practices, and the Independent Counsel concluded:  "Hiring and promotion processes have been fraudulently orchestrated from beginning to end in favor of connected candidates.  The fraud begins [at the] top with Commissioner O'Brien, and it extends through most of the hierarchy of the Department who participate in interviewing candidates for hiring and promotion."  Paul F. Ware, Jr., Report of the Independent Counsel, In the Matter of the Probation Department of the Trial Court 3 (SJC No. 0E-123, Nov. 9, 2010), http://www.mass.gov/courts/docs/sjc/docs/report-of-independent-counsel-110910.pdf.

-13-

Massachusetts gratuities and bribery violations.[2]  Each mail fraud count and predicate act was based on a particular hire between 2001 and 2010.

The defendants moved to dismiss the indictment on various grounds.  Among other things, they contended that the alleged mailings -- rejection letters sent to unsuccessful applicants -- did not satisfy the interstate commerce element of the federal mail fraud statute.  They also sought to dismiss the RICO counts on grounds that the Government had failed to demonstrate the necessary link between a "thing of value" and an "official act" as required under the Massachusetts bribery and gratuities statute.  Following a motion hearing, the district court denied the motion in a written opinion and order.

The parties proceeded to a forty-seven day jury trial. Throughout the trial, the district court allowed the jury to submit questions for the court to pose to the witnesses.  Jurors submitted 281 questions, 180 of which were asked by the court.  The jury found all three defendants guilty of RICO conspiracy.  O'Brien and Tavares were found guilty of the substantive RICO count, with the jury finding ten of the seventeen mail fraud predicates proven as

[2]  The indictment also included counts for bribery concerning a program receiving federal funds under 18 U.S.C. § 371 and 18 U.S.C. § 666(a)(2).  These counts were dismissed on the Government's motion and are not relevant here.

to O'Brien (as a principal) and Tavares (as either an aider and abettor, a coconspirator, or both) and nine gratuities acts proven as to O'Brien. The jury found none of the predicate bribery acts proven. Of the nine mail fraud counts ultimately submitted to the jury, O'Brien and Tavares were adjudged guilty of four, with O'Brien guilty as a principal and Tavares guilty as both a coconspirator and aider and abettor as to two and an aider and abettor as to the remaining two. Burke was acquitted on the mail fraud counts.

The defendants bring a panoply of arguments on appeal. We address only their most salient claims and pass no judgment on any issues not addressed herein.

## II.

Viewing the evidence in the light most favorable to the verdict, we can conclude that O'Brien, along with the other defendants and many other members of the Probation Department, misran the Probation Department and made efforts to conceal the patronage hiring system. But "[b]ad men, like good men, are entitled to be tried and sentenced in accordance with law." Green v. United States, 365 U.S. 301, 309 (1961) (Black, J., dissenting). This case involves state officials' efforts to increase funding for their department through closed-door arrangements with state legislators and other public officials. But not all unappealing

-15-

conduct is criminal.  As sovereigns, states have "the prerogative

to regulate the permissible scope of interactions between state

officials and their constituents," and the Supreme Court has warned

against interpreting federal laws "'in a manner that . . . involves

the Federal Government in setting standards' of 'good government

for local and state officials.'"  McDonnell v. United States, 136

S. Ct. 2355, 2373 (2016) (quoting McNally v. United States, 483

U.S. 350, 360 (1987)).  For the reasons discussed herein, we find

that the Government has not in fact demonstrated that the conduct

satisfies the appropriate criminal statutes, and we therefore

reverse.[3]

## A.  State Gratuities (Count II:  Predicates 44(b)-51(b), 53(b))[4]

Under the federal RICO statute, "[i]t shall be unlawful

for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or

---

[3] This does not mean that these practices cannot have consequences. Here, the Independent Counsel appointed by the Massachusetts Supreme Judicial Court recommended both remedial personnel actions and policy changes at the OCP, and a number of steps have been taken to discipline the perpetrators and safeguard the OCP against similar abuses.  See Report of the Independent Counsel 41-48; see also Scott Allen, SJC Orders Probation Overhaul as Report Finds Rampant Fraud, Bos. Globe, Nov. 19, 2010.

[4]  These numbers refer to the corresponding counts and predicate acts as identified in the second superseding indictment.

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c). RICO and RICO conspiracy counts "require[] at least two acts of racketeering activity."  18 U.S.C. § 1961(5).  A "racketeering activity" includes "any act or threat involving . . . bribery . . . which is chargeable under state law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).  For O'Brien, the jury found nine predicate acts under the Massachusetts gratuities statute, Mass. Gen. Laws ch. 268A § 3(a).  O'Brien argues that the indictment did not sufficiently allege violations of the Massachusetts gratuities statute and that the evidence proffered at trial was insufficient to establish the gratuity violations charged.

The Massachusetts gratuities statute penalizes those who give illegal gratuities to officials, id., as well as officials who receive illegal gratuities, id. § 3(b).  Here, the Government sought to prove that O'Brien "knowingly . . . offer[ed] or promis[ed] anything of substantial value" to a public official "for or because of any official act performed or to be performed" by that official.  Id. § 3(a).[5]

---

[5]  The federal gratuities statute, 18 U.S.C. § 201, contains language similar to that of its state analogue, and, as a result, Massachusetts courts "look to Federal law for guidance in construing § 3(a) and (b)."  Scaccia v. State Ethics Comm'n, 727

-17-

A gratuity may be given as "a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action." Scaccia, 727 N.E.2d at 828-29. Mere proof of the public official's position is insufficient to demonstrate an "official act" under the statute: "[t]he insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 406 (1999). "[T]he government must 'prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given.'" Scaccia, 727 N.E.2d at 828 (quoting Sun-Diamond Growers of Cal., 526 U.S. at 414).

In that vein, the Government cannot show the requisite linkage merely by demonstrating that the gratuity was given "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." Sun-Diamond Growers of Cal., 526 U.S. at 405. Recognizing that direct evidence of these sorts of violations may be difficult to obtain, Massachusetts courts accept "evidence regarding the subject matter of pending legislation and its impact on the giver,

_____

N.E.2d 824, 828 (Mass. 2000). Accordingly, we reference both state and federal law in our analysis.

the outcome of particular votes, the timing of the gift, or changes in a voting pattern" to demonstrate the requisite linkage. Scaccia, 727 N.E.2d at 829. We bypass the question of whether the indictment sufficiently alleged violations of Mass. Gen. Laws ch. 268A § 3 and turn to whether the Government presented sufficient evidence that O'Brien violated the statute.[6] We conclude that it did not.

The Government groups the predicate acts into two categories: the Kathleen Petrolati predicate act (Act 44(b)) and the 2007-2008 Electric Monitoring Program ("ELMO") Appointments predicate acts (Acts 45(b)-51(b), 53(b)). Both categories of predicate acts relate to a series of temporary hires for purposes of the ELMO program. In 2006, the Massachusetts legislature passed a new law providing for mandatory electronic monitoring of sex offenders. In 2007 and 2008, OCP received additional funding for new hires to implement the monitoring system. O'Brien proposed that these individuals be hired on a temporary basis. According to Mucci, the appointments were designated as temporary so that O'Brien could "get people hired without going through the hiring process and the interviewing process." O'Brien gave Mucci names

---

[6] Likewise, we address only the sufficiency of the evidence (as opposed to the sufficiency of the indictment) for the remaining claims addressed herein.

-19-

of individuals and instructions to offer them ELMO positions.  The individuals did not interview with anyone at the OCP prior to receiving an offer.

The Government's evidence as to the gratuities predicates does not show adequate linkage between the thing of "substantial value" conferred by O'Brien (the jobs) and an "official act" performed or to be performed.  See Life Ins. Ass'n of Mass., Inc. v. State Ethics Comm'n, 727 N.E.2d 819, 820-21 (Mass. 2000) (remanding to the State Ethics Commission to "make adequate findings on whether there was . . . any link to a specific act"); Commonwealth v. Vázquez, 870 N.E.2d 656, 663 (Mass. App. Ct. 2007).  Many of the Government's arguments are predicated on bootstrapping:  because O'Brien was constantly conferring with legislators and hiring based on legislative preferences, any "official act" taken by an affected legislator must satisfy the nexus requirement.  But we do not read the gratuities statute so broadly:  the Supreme Court in Sun-Diamond "offered a strictly worded requirement that the government show a link to a 'specific official act' to supply a limiting principle that would distinguish an illegal gratuity from a legal one," a principle unnecessary "in the extortion or bribery contexts."  United States v. Ganim, 510 F.3d 134, 146 (2d Cir. 2007).  Given a choice between treating a gratuities statute as "a meat axe or a scalpel," the Supreme Court

-20-

chose the latter, and we follow suit. Sun-Diamond Growers of Cal.,
526 U.S. at 412; see also Valdes v. United States, 475 F.3d 1319,
1323 (D.C. Cir. 2007) ("Sun-Diamond's interpretive gloss, like the
rule of lenity, thus works to protect a citizen from punishment
under a statute that gives at best dubious notice that it has
criminalized his conduct.").

### 1. The Petrolati Predicate Act

The Government contended that Kathleen Petrolati's
husband, Massachusetts House Representative Thomas Petrolati,
proposed a budget amendment in April 2000 that would increase
funding for positions in OCP, adding two program managers, two
court service coordinators, and ten assistant court service
coordinators. O'Brien, in turn, appointed Representative
Petrolati's wife, Kathleen Petrolati, as a program manager in the
ELMO program in November 2000. That spring, the OCP had funding
to add the positions specified in the budget amendment.

The Government asserts that the jury could infer the
necessary link based on Representative Petrolati's sponsorship of
the budget amendment and his wife being appointed a program
manager. But seven months passed between these two events, and
there was no evidence that O'Brien knew of Representative
Petrolati's connection to the budget amendment or that
Representative Petrolati had "change[d]" his "voting pattern" in

-21-

anticipation of his wife's hire.  Scaccia, 727 N.E.2d at 829.  To the contrary, Representative Petrolati also sponsored amendments appropriating money to courts across Western Massachusetts.

## 2.  The ELMO Appointments Predicate Acts

For the ELMO Appointments predicate acts, the Government sought to show that O'Brien "gave" ELMO appointments to Representative Robert DeLeo, then Chairman of the House Ways and Means Committee, to garner support for DeLeo's run for Speaker of the House, and that DeLeo then offered various legislators the opportunity to appoint individuals for these positions in exchange for their voting for DeLeo.  In addition, in September 2007, after O'Brien had appointed several ELMO candidates referred through DeLeo's office, O'Brien met with DeLeo to propose legislation that would curtail the CJAM's oversight over O'Brien's appointments, grant O'Brien life tenure, and fix his salary at $1,000 per year below that of the CJAM.

The Government contends that one of the "official acts" was an amendment that O'Brien proposed at a meeting with DeLeo that would have made O'Brien the effective czar of probation.  Yet the Government fails to explain how this meeting is linked to the ELMO hires or specify to which ELMO hires it relates, instead vaguely noting that O'Brien had appointed "two or three" referrals for ELMO positions by the time of the meeting.

-22-

Further, the Government did not prove that DeLeo took any action on O'Brien's proposals, or that O'Brien pressured DeLeo to do so "for or because of" a specific ELMO hire. "Official act" is defined as "any decision or action in a particular matter or in the enactment of legislation." Mass. Gen. Laws ch. 268A § 1(h). The Supreme Court recently explained that an "official act," similarly defined under 18 U.S.C. § 201(a)(3),[7] requires more than mere discussion:

> [H]osting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action' within the meaning of § 201(a)(3), even if the event, meeting, or speech is related to a pending question or matter. Instead, something more is required: § 201(a)(3) specifies that the public official must make a decision or take an action on that question or matter, or agree to do so.

McDonnell v. United States, 136 S. Ct. 2355, 2370 (2016).

All the Government demonstrated, however, is that O'Brien and DeLeo met. The evidence does not show, for example, that DeLeo subsequently introduced a bill based on either of O'Brien's proposals or took some official act with respect to such a bill proposed by another legislator. The Government also

---

[7] "[A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity . . . ."

identifies no particular statements that O'Brien or DeLeo made about the proposals, or other evidence about that meeting, from which a jury might reasonably infer what specific official act, if any, O'Brien was trying to induce DeLeo to take. Thus, the evidence reveals no specific official act -- either taken by DeLeo or merely sought from him -- to which we could apply the Scaccia factors to determine its possible link to the "two or three" ELMO appointments. The evidence therefore does not support a finding that the "official act" requirement was met, or that it was linked to the gratuity.

The Government also contends that the ELMO hires correlate to an "official act" in that O'Brien gave DeLeo's office referral opportunities to pass on to legislators to build support for the Speaker's race. Edward Ryan, DeLeo's legislative liaison, testified that DeLeo and his staff used the jobs to "gather support" for DeLeo, and that O'Brien told him that DeLeo's office had "identified" individuals that they "were looking for to vote for Bob DeLeo for the Speaker's race."

But while a legislator's vote in a leadership election may constitute an official act, the Government needed to prove, as the district court instructed the jury, a link between the gratuity that O'Brien gave DeLeo and a specific official act that DeLeo

would undertake.[8]  The Government does not explain, however, how other legislators' votes for DeLeo could qualify as DeLeo's official acts.  And no such explanation occurs to us.

The evidence shows at most that O'Brien gave DeLeo control over the ELMO appointments to enable DeLeo to round up votes from other legislators.  Such evidence may suffice to show

_____

[8]  Specifically, the district court instructed the jury:

> Now here's what they've got to prove for an illegal gratuity.  That Mr. O'Brien gave a thing of value to a public official.  Now here he doesn't have to have the agreement with Mr. DeLeo and going after the state representatives, here he would give this right of selection, this right of appointment, to Mr. DeLeo.  Mr. DeLeo is a public official. All right.  And the second thing they've got to prove is that the reason Mr. O'Brien did that, if you believe he did do it, he did it for or on account of some specific act to be performed <u>by that official</u>.

Moreover, the Government did not argue that O'Brien gave the gratuity directly to the other legislators to induce their votes for DeLeo in the Speaker's race, or that O'Brien and DeLeo conspired to do so.  In fact, the district court described the alleged gratuity from O'Brien to DeLeo as follows:  "[O'Brien] would give this right of selection, this right of appointment, <u>to Mr. DeLeo</u>."  The Government echoed this description in its closing argument:  "O'Brien gave jobs, he gave ELMO jobs to . . . Robert DeLeo, so that Robert DeLeo could hand those jobs out to other members of the House of Representatives."  The Government's brief on appeal, moreover, focuses on O'Brien having given DeLeo a gratuity by giving him the power to select ELMO hires, which would enable DeLeo to attract support for his race for Speaker by passing along the candidates preferred by legislators who would support him in the race.

that O'Brien gave the ELMO appointments to DeLeo to facilitate his path to power in the state house, in the hope that, by building up a "reservoir of goodwill" with DeLeo, the future speaker would use his power to benefit the Probation Department's budget.[9]  See Sun-Diamond Growers of Cal., 526 U.S. at 405.  But that is only evidence that O'Brien was seeking general legislative support from DeLeo, and, under Sun-Diamond and Scaccia, that is not sufficient to show a specific public act, and with it an illegal gratuity.  See Sun-Diamond Growers of Cal., 526 U.S. at 405-08; Scaccia, 727 N.E.2d at 828.  We therefore do not interpret the Massachusetts gratuities statute to reach the conduct described here.

**B. Mail Fraud (Count I: Predicate Acts 1-4, 12-14, 17, 18, 20; Counts III-VI)**

To prove a violation of the federal mail fraud statute under 18 U.S.C. § 1341, the Government must prove:  "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use  of interstate mail communications in furtherance of that scheme."  United States v. Hebshie, 549 F.3d 30, 35-36

---

[9]  We note, however, that Representative Eric Rice testified that he received the opportunity to refer an individual for the ELMO position "a year or more" before the Speaker's race, previously had recommended individuals for public and private sector positions, and did not understand the referral to be contingent on his vote for DeLeo.  This testimony is consistent with the responses of other legislators invited to make ELMO referrals.

-26-

(1st Cir. 2008) (internal formatting omitted) (quoting United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004)). The jury found O'Brien and Tavares guilty of mail fraud Counts Three, Four, Five, and Six, and found ten predicate acts of mail fraud for purposes of O'Brien's and Tavares's substantive RICO count. O'Brien and Tavares now challenge their mail fraud convictions on multiple fronts, contending that the indictment was insufficient to support the mail fraud allegations and the evidence insufficient to support their convictions. Among other things, they contend that the Government did not demonstrate that the mailings were "in furtherance" of the hiring scheme.

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." Schmuck v. United States, 489 U.S. 705, 710 (1989) (quoting Kann v. United States, 323 U.S. 88, 95 (1944)). "[T]he mailing must be 'for the purpose of executing the scheme, as the statute requires.'" United States v. Maze, 414 U.S. 395, 400 (1974) (quoting Kann, 323 U.S. at 94). A mailing furthers a fraudulent scheme if it is, inter alia, "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and

therefore make the apprehension of the defendants less likely than if no mailings had taken place." Id. at 403.

The mailing requirement is interpreted broadly, however, and "the use of the mails need not be an essential element of the scheme." Schmuck, 489 U.S. at 710. Rather, the charged mailing need only be "incident to an essential part of the scheme." Hebshie, 549 F.3d at 36 (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)). Further, "the defendant need not personally mail anything so long as it is reasonably foreseeable that the mails will be used in the ordinary course of business to further the scheme." United States v. Cacho-Bonilla, 404 F.3d 84, 90 (1st Cir. 2005).

From this, two propositions emerge. First, a mailing can serve as the basis for a mail fraud conviction even if the fraud would have been successful had the mailing never occurred. Second, however, that mailing -- even if dispensable -- must at least have some tendency to facilitate execution of the fraud. In determining whether the Government proved the mailing element, "we look to see 'whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the

essential elements of the crime.'" United States v. Soto, 799 F.3d 68, 93 (1st Cir. 2015) (quoting Hebshie, 549 F.3d at 35).

Even assuming that there was "a scheme to defraud," the Government did not present substantial evidence of a mailing "in furtherance of" such a scheme. Hebshie, 549 F.3d at 35-36. The Government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected,[10] to satisfy the mailing requirement. These mailings fulfilled a requirement in the Manual that "[a]pplicants who are not selected for appointment must be notified in writing that they have not been selected." The Government argues that such rejection letters in a corrupt hiring system satisfy § 1341's mailing element where they help to maintain a facade of a merit-based system. See United States v. Sorich, 523 F.3d 702, 714 (7th Cir. 2008) (determining that rejection letters "lent a false air of propriety and regularity to the city's hiring process"); see

---

[10] Some of the rejection letters were mailed before Judge Mulligan approved the person eventually hired. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition, while the Government asserts that the scheme was not complete until Judge Mulligan gave his final approval. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. See Kann, 323 U.S. at 94 ("It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank.").

also <u>United States</u> v. <u>Fernández</u>, 282 F.3d 500, 508 (7th Cir. 2002) ("These notifications were not merely ancillary to the execution of the fraud, rather, [they] falsely portray[ed] to anyone who examined Lyons' records that the bids submitted were legitimate, thereby concealing the true nature of the scheme."). But the Government presented no evidence that would allow the jury to infer that the rejection letters in this case served this duplicitous function. Had unsuccessful applicants received no notice, they may have assumed they were not hired or else called OCP to check their status. The Government identifies language in the rejection letters stating that "[t]he selection of the final candidate was a difficult process" and that the deputy commissioners "were very impressed with [the recipients'] qualifications" to demonstrate that the letters were intended to convince rejected candidates that their selection was based on merit. We are not convinced that such vague platitudes, hallmarks of any rejection letter, sufficiently demonstrate that the rejections had any real tendency to convey a merit-based selection system.

In arguing to the contrary, the Government points to this circuit's decision in <u>United States</u> v. <u>Cacho-Bonilla</u>, 404 F.3d 84 (1st Cir. 2005) -- a case in which we found the "connection between the scheme and the mailing . . . unusually thin" and observed that "the [mail fraud] count would better have been

-30-

omitted," id. at 90.  In Cacho-Bonilla, the defendants were convicted of mail fraud for their involvement in a scheme where they misused federal funds provided to their non-profit corporation, Acción Social de Puerto Rico, Inc. ("ASPRI").  Id. at 87.  The defendants submitted monthly reports reflecting fraudulent markups to a state agency.  Id. at 90.  The agency then compiled the reports into summaries and sent the summaries, by mail, to the Department of Health and Human Services ("HHS").  Id. In determining that these reports satisfied the mailing requirement, this court explained:

> Much of the scheme . . . depended upon the
> continuation of federal funding for ASPRI.  In
> turn, the submission (by mail) of ASPRI data
> to HHS's data collection entity perpetuated
> the relationship that kept funds flowing to
> ASPRI . . . .  So viewed, the perpetuation was
> essential to the scheme and the mailing was
> incidental to that perpetuation.

Id. at 91.  Similarly, in United States v. Hebshie, 549 F.3d 30 (1st Cir. 2008), we found that a reservation-of-rights letter sent to a defendant after he submitted a fraudulent insurance claim was sufficient under § 1341, describing the letter as "part of 'the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed, and are ultimately paid, thereby making the fraud successful.'" Id. at 38 (quoting United States v. Morrow, 39 F.3d 1228, 1237 (1st Cir. 1994)).

-31-

In both Cacho-Bonilla and Hebshie, however, the mailing was part of an ongoing relationship -- whether between ASPRI and its source of federal funds or between the fraudster and the defrauded insurance company -- necessary to effectuate the fraud. The Supreme Court's decision in Schmuck v. United States, 489 U.S. 705 (1989), is instructive. In Schmuck, the Court upheld the mail fraud conviction of a used-car distributor who rolled back the odometers on cars and sold those cars at artificially inflated prices to dealers, who in turn resold the cars to customers. Id. at 707, 722. The retail sellers' submission of title-application forms to the state Department of Transportation on behalf of their customers satisfied the mailing requirement. Id. at 707. The Court found that the registration-form mailings, which "may not have contributed directly to the duping of either the retail dealers or the customers, . . . were necessary to the passage of title." Id. at 712. And the passage of title "was essential to the perpetuation of [the] scheme," id., because "the success of [the] venture depended upon [the defendant's] continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their . . . customers," id. at 711-12.

Here, in contrast, the Government has presented no evidence that the continued relationship between the OCP and

-32-

rejected applicants was of any consequence. Nor has the Government produced evidence that the rejection letters furthered any relationship -- say, between the OCP and Judge Mulligan -- that was of consequence, or facilitated O'Brien's ability to make appointments or to receive approval for those appointments.

Instead, the Government reasons that the letters tended to perpetuate the scheme by making the rejected applicant less likely to call to inquire as to his status, thereby making it less likely that such a call might lead to some inquiry that would uncover the scheme. Even though employers need not -- and often do not -- send rejection letters to unsuccessful applicants, we will assume that the Government is correct that sending the letters decreased the odds that rejected applicants would call to learn their status. But the second part of the Government's nexus hypothesis (i.e., that such calls may have led to discovery of the scheme) rests on nothing more than rank speculation. The Government's evidence provided no plausible mechanism by which a call from a rejected applicant asking about his or her status would lead to the discovery of the scheme. Nor has the Government demonstrated that sending the letters meaningfully decreased the likelihood that some other party would have uncovered the hiring scheme. And while the mailing was certainly incidental to providing a courtesy to unsuccessful applicants, providing such a

courtesy was not sufficiently tied to the defendants' interest in perpetrating the scheme because it furthered neither the perpetration nor the perpetuation of the scheme. None of the remaining cases cited by the Government are factually analogous to the case before us, and they do not require us to find that these rejection letters were sent "in furtherance of" the defendants' scheme.

Racketeering predicate acts fourteen and seventeen involved mailings other than rejection letters. Predicate act fourteen involved a copy of a letter that Judge Mulligan sent O'Brien approving charged-hire Douglas MacLean's appointment. The Government contends that the mailing requirement was satisfied because the Chief Probation Officer that would be working with MacLean received a copy of this appointment letter by mail, and Judge Mulligan's written approval was required before MacLean could begin his employ. But we know nothing about why the letter was mailed to the Chief Probation Officer in this instance. To be sure, "[t]he 'in furtherance' requirement is to be broadly read and applied." Hebshie, 549 F.3d at 36. Section 1341's mailing requirement, however, places an important limitation on federal authority. See Kann, 323 U.S. at 95.

> Congress could have drafted the mail fraud
> statute so as to require only that the mails
> be in fact used as a result of the fraudulent
> scheme. But it did not do this; instead, it

> required that the use of the mails be "for the purpose of executing such scheme or artifice."

Maze, 414 U.S. at 405 (footnote and alteration omitted). The record does not demonstrate that the appointment letter was sent for this purpose, and we therefore find § 1341's jurisdictional element is not satisfied for purposes of predicate act fourteen.

Predicate act seventeen involved a mailed application. But RICO claims require two predicate acts, and the Government does not present sufficient evidence of a mailing for purposes of any other mail fraud predicate act. Accordingly, we need not address whether the evidence of a mailed application is sufficient to satisfy § 1341's mailing requirement for predicate act seventeen.[11]

## C. Juror Questions

Although we reverse based on more central issues, making the present issue moot, we must express our reservations about the extent and type of juror questions allowed by the trial judge in this case.

Whether to allow juror questions falls "to the sound discretion of the trial court." United States v. Sutton, 970 F.2d

---

[11] Because there was insufficient evidence of mailings in furtherance of the scheme to defraud, we need not decide at what point evidence of a corrupt process can demonstrate a deprivation of property.

1001, 1005 (1st Cir. 1992). But, as we have previously cautioned, jury questioning "should be reserved for exceptional situations, and should not become the routine, even in complex cases." United States v. Cassiere, 4 F.3d 1006, 1017 (1st Cir. 1993). Here, jurors submitted 281 questions, and the district court posed 180 of them to witnesses. That means that, over thirty-five days of testimony, eight questions were submitted and five questions asked per day on average. This volume of questions is far beyond anything approved of in this Circuit[12] and suggests that the district court allowed juror questions to become routine rather than an exception.

Furthermore, the content of many of the questions jurors asked is troubling. Juror questions should serve the limited purpose of clarification, see id. at 1017, and they should be a "long-odds exception" reserved for the most critical points, Sutton, 970 F.2d at 1005. Here, though, the trial judge told the jurors that their questions should be guided by whether "the lawyer gets out what interests you from the witness." This invitation to go beyond seeking clarification led to questions (allowed over objection) like whether "some candidate [did] not make the list

---

[12] By comparison, "Sutton involved seven jury questions the court asked during a 2 ½ day trial," while "[Cassiere] involve[d] eleven questions asked during a 24-day trial." Cassiere, 4 F.3d at 1017.

because recommended names were on the list" and "Why did you change James Rush's score."  Juror questions of this type elicited not just clarifications but gap-filling evidence.[13]  "[I]n a jury trial the primary finders of fact are the jurors.  Their overriding responsibility is to stand between the accused and a potentially arbitrary or abusive Government that is in command of the criminal sanction."  United States v. Martin Linen Supply Co., 430 U.S. 564, 572 (1977).  If a district court allows jurors to ask questions, it must ensure that the jurors do not turn into fact gatherers rather than factfinders by exceeding the bounds delineated in Sutton and Cassiere.

### III.

We find the evidence insufficient to support the defendants' convictions and order the entry of judgments of acquittal.

**So ordered.**

---

[13]  For example, (although without objection) jurors posed multiple questions to OCP employees concerning how those employees ranked candidates or whether they passed over unqualified candidates. Similarly, jurors questioned why certain witnesses went along with the scheme, or did not report their concerns about the hiring process.