USA v. Boyland

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued:  February 22, 2017                                    Decided:  July 10, 2017)

Docket No. 15-3118

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

WILLIAM F. BOYLAND, JR.,

*Defendant-Appellant.*[*]

_____

Before:  KEARSE, WALKER, and HALL, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Sandra L. Townes, *Judge*, convicting defendant on 21 counts of public-corruption-related offenses, *see* 18 U.S.C. §§ 371, 666, 1343, 1349, 1951(a), and sentencing him principally to 168 months' imprisonment, to be followed by a three-year term of supervised release, and ordering him to forfeit $169,410.14 and pay $155,610.14 in restitution.  On appeal, defendant challenges his conviction, contending primarily that the jury instructions with respect to 19 of his counts of

---

[*]The Clerk of Court is respectfully directed to amend the caption as set forth above.

conviction were erroneous in light of the Supreme Court's subsequent decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which narrowed the interpretation of "official act" within the meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections prohibiting *quid pro quo* corruption. The government concedes that, in light of *McDonnell*, the district court's instructions on 11 honest-services wire fraud counts were erroneous. We conclude that those instructions, to which defendant did not object at trial, do not meet the "plain error" standard; and we find no basis for reversal in defendant's other contentions.

Affirmed.

LAN X. NGUYEN, Assistant United States Attorney, Brooklyn, New York (Robert L. Capers, United States Attorney for the Eastern District of New York, Amy Busa, Assistant United States Attorney, Brooklyn, New York, on the brief), *for Appellee*.

JAMES M. BRANDEN, New York, New York, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant William F. Boyland, Jr. ("Boyland"), appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Sandra L. Townes, *Judge*, convicting him on 21 counts of public-corruption-related offenses, to wit: Hobbs Act extortion conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951(a) (Counts One, Two, Sixteen, and Eighteen), conspiracy to commit bribery and to violate the Travel Act, in violation of *id*. § 371 (Counts Three and Seventeen), bribery in violation of *id*. § 666(a)(1)(B) (Counts

Four and Nineteen), honest-services wire fraud conspiracy and honest-services mail fraud conspiracy, in violation of *id*. § 1349 (Counts Five and Twenty-One), 10 counts of honest-services wire fraud, in violation of *id*. § 1343 (Counts Six-Fifteen), and theft of government property in violation of *id*. § 666(a)(1)(A) (Count Twenty).  He was sentenced principally to 168 months' imprisonment, to be followed by a three-year term of supervised release, and was ordered to forfeit $169,410.14 and to pay $155,610.14 in restitution.

On appeal, Boyland challenges his conviction, contending primarily that the jury instructions with respect to Counts One through Nineteen were erroneous in light of *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which narrowed the interpretation of "official act" within the meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections prohibiting *quid pro quo* corruption.  He also argues that certain evidence was improperly admitted at trial.  The government concedes that, in light of *McDonnell*, the instructions on Counts Five through Fifteen, the honest-services wire fraud counts, were erroneous.  For the reasons that follow, we conclude that the trial court's instructions on Counts Three, Four, Seventeen, and Nineteen through Twenty One were not erroneous; that the instructions on the Hobbs Act and honest-services wire fraud counts, to which defendant did not object at trial, do not meet the "plain error" standard; and that Boyland's other contentions provide no basis for reversal.

## I.  BACKGROUND

At the times pertinent to this prosecution, Boyland was an elected member of the New York State Assembly, representing the 55th Assembly District, an area that includes the Brownsville,

Bedford-Stuyvesant, Crown Heights, and Bushwick sections of Brooklyn. In the 21-count superseding indictment (the "Indictment") Boyland was charged principally with engaging in honest-services wire fraud, in schemes to, *inter alia*, solicit bribes in connection with a proposed carnival and in connection with a proposed real estate venture for which New York State ("State") grant monies were to be obtained.

The government's evidence at Boyland's several-week trial, the sufficiency of which is not challenged on appeal, included numerous audio and video recordings--the accuracy of which was stipulated (*see* Trial Transcript ("Tr.") 87-91)--as well as emails and documents; testimony by Federal Bureau of Investigation ("FBI") special agents Brian Getson and Sean Quinn, who operated undercover in meeting with Boyland and his aides in connection with schemes through which Boyland and the undercover agents were to receive New York City ("City") permits or State monies; testimony by numerous other witnesses as to the precise mechanics of those schemes; and testimony by Ry-Ann Hermon, Boyland's then-chief of staff who, prior to Boyland's trial, had pleaded guilty to bribery and extortion charges. The trial evidence, taken in the light most favorable to the government, included the following.

A.    *The Evidence*

Getson testified that in August 2010, Alan Weiner--a carnival promoter who had passed away before Boyland's trial, but who in 2010-2011 was working with the government after pleading guilty to charges relating to bribing public officials--contacted Boyland, with whom he had had a relationship for several years, and offered Boyland money in exchange for helping to secure permits for a carnival to be held in Boyland's Brooklyn assembly district. (*See* Tr. 77-78.) Getson testified

(without objection) that he learned that "Boyland responded that," "[i]n exchange for his assistance getting carnivals in the assembly district," "he would be willing to take money from a nonprofit" corporation. (*Id*. at 78.)

Weiner thereafter introduced Boyland to Getson, who was posing as a Philadelphia promoter of carnivals and real estate businesses who was willing to pay bribes as a means of doing business. All of the meetings Getson had with Boyland and/or his representatives were recorded. (*See id*. at 85.)

### 1. *The Carnival Scheme*

In order to operate a carnival on City-owned property, an owner must obtain various licenses and permits from the relevant City agencies. Getson was introduced to Boyland by Weiner in August 2010 at Boyland's district office, and the three discussed the process of "secur[ing] the property" (Government Exhibit ("GX") T-301, at 3) on which Getson and Weiner claimed to want to hold a carnival--a site on Rockaway Avenue in Brownsville--meaning obtaining the necessary permits for that property.

City agency approval is facilitated by letters of support from local elected officials. At that meeting, Boyland stated he would "have this thing locked up" and "have the okays done . . . by early next week" (*id*. at 4), as the Rockaway property was owned by the City; Getson testified he understood this to mean that Boyland would "get the okays" from "whatever city agencies would have control over that property at Rockaway" (Tr. 101).

5

In October 2010, Getson, Boyland, and Weiner had a dinner meeting. Boyland indicated that approval would be forthcoming from the City's Department of Housing Preservation and Development ("HPD"), a relevant agency that had not been identified at their prior meeting. (*See* Tr. 108-10.) Boyland said, "So guys, how do we do business? What's our next steps here? . . . . How do we do business? What's our next steps here? . . . . 'Cause we got HPD. HPD is locked up. We're there." (GX T-302, at 1.)

Later in the conversation, Boyland said he would be running for reelection in 2012 (*id*. at 15-16), and Weiner responded, "Obviously, obviously you will get support from us" (*id*. at 16), leading to the following colloquy:

[Boyland]: Yeah? We are just in a money raising mode right now.

[Getson]: What can we do for you in that regard?

[Boyland]: Well I'll get you something. We're just in this ... I've got something coming on the 28th. It's a ... We gotta ... On this end, it is not a big deal. We have about a 100 grand we have to have in the pot. You know that is just to sustain ourselves and help others around us because that is the name of the game, of course, and, um, building. We will have all kinds of conversations about it but that is the number at this point.

(*Id*.)

Boyland stated that he had found it more profitable to have fundraisers at small private venues and "we are having something on the 28th. I'll send you an invite. You get your network to come out and support it or whatever." (*Id*. at 16-17.) Getson testified that he asked whether Boyland had any type of non-profit organization set up, and Boyland responded that he had four. Getson then talked about compensating Boyland, "directly paying him for his assistance in helping us with the carnivals," and that "Boyland's idea was some kind of consultancy or consulting agreement"

(Tr. 126-27):

> [Getson]: What are, what are, so what are like in terms of like can I compensate you or whatever for helping us out or setting up the meetings for us what is the best kind of approach?
>
> [Boyland]: Um, a consultancy, a consulting firm, folks we have worked with in the past. You know?
>
> [Getson]: Yeah?
>
> [Boyland]: You will be introduced to those guys.

(GX T-302, at 17.)

Four days later, Getson and Boyland spoke by telephone. Boyland said he had "all of the . . . information regarding the parks"; that he would soon "have okays on everything"; and that he was going to "send [Getson] the invite" for the fundraiser. (GX T-303, at 2.)

The following week, Getson received two emails from Boyland's office. One contained a lease application for the carnival. The other was an invitation to Boyland's October 28 fundraising event, with suggested contributions ranging from $1,000 to $3,800. (Tr. 143.) Getson attended the fundraiser and made a $3,800 contribution, the maximum allowed for an individual contribution to a candidate for state election.

On November 3, 2010, Getson, Weiner and Boyland had another dinner meeting. Boyland announced that he had met with the new Parks president and that they "pretty much ha[d] the green light" for "anywhere we're gonna do [a carnival] in Brooklyn." (GX T-305, at 3.) Weiner suggested that the approval process would be expedited if Boyland were to write supporting letters directly to the licensing/permitting agencies. Boyland appeared to acquiesce.

As the plans for the carnival progressed, however, Boyland began asking Getson for more money. For example, on January 17, 2011, Boyland told Getson by telephone that he was "a thousand dollars short on some gospel sponsorship for a band" and asked if Getson could provide him the money. (Tr. 213.) Getson agreed but stated that, due to logistics, he would be unable to do so until after the gospel event. At a dinner the following week, after assuring Getson that they were "[g]ood to go" with the city agencies and that he had completed the letter of support, Boyland again inquired about the money, asking if he could "have [his] girl [Hermon] call [Getson] about that gospel thing." (GX T-308, at 2, 32.) After Getson agreed (*see* Tr. at 257), Hermon contacted him in early February asking him for "$2,000 for a bus trip to Albany" (Tr. 266). Thereafter, Getson received an invoice from Boyland's office in the amount of $3,000.

Getson paid that sum on February 17, 2011, outside of Boyland's office. He had come to the office to see Boyland; but Boyland's father--former Assemblyman William F. Boyland Sr. ("Frank Boyland")--was there and said, "[l]et's step outside and you and I'll take care of this. . . . You know how it is" (GX T-101, at 7). Thus, out on the sidewalk, Getson handed Boyland's father a $3,000 check, with the payee line left blank. The elder Boyland, upon receiving the check for his son, said to Getson, "[J]ust legally, you know, you know[ ]this is against the law, right?" to which Getson responded, "[o]h, absolutely." (*Id*. at 10.)

The two then reentered the building, and Getson saw Frank Boyland go back to Boyland's office. Getson then met with Boyland and Frank Boyland in Boyland's office to discuss the carnival plans. Boyland referred to letters of support that Weiner had previously drafted for Boyland's signature (*see*, *e.g.*, GX LC-2A (Boyland Letter to NYC Department of Consumer Affairs Commissioner Jonathan Mintz, dated February 24, 2011 ("vouch[ing]" for Weiner's experience "and

character"))) and said they were "good" (GX T-101, at 11). Getson then handed Boyland "fresh" letters of support for Boyland to provide. (Tr. 303.) Boyland accepted the new drafts (*see* GX T-101, at 12), which were thereafter typed on Assembly letterhead, signed by Boyland, and given to Weiner (*see*, *e.g.*, GX LC-2E (Boyland Letter to Commissioner Mintz, dated March 8, 2011 ("I am writing to express my strong support for these permits and request that you grant them expeditiously. . . . I know that you will look favorably on this application and grant your approval."))).

Getson testified that "almost immediately after this [February 17] meeting" he received a call from Hermon, who stated that Boyland had put her on the carnival project in order to "expedite everything through." (Tr. 331.) Indeed, Hermon had so stated in a voicemail message left on Getson's phone shortly after the meeting, in which she "express[ed her] gratitude on behalf of Assemblyman Boyland for [Getson's] assistance" on their projects. (GX T-311, at 1.) At trial, Hermon testified that she attributed Boyland's instruction to expedite the carnival matter to the fact that Getson "gave [Boyland] money." (Tr. 1603.)

2. *The Real Estate Scheme*

During an October 2010 telephone conversation with Getson about the carnival application, Boyland said he was "looking for some investors" for a $140 million hospital project in his district. (GX T-303, at 3.) Twice thereafter, Getson mentioned that he had a "business partner" who might be interested. Boyland said he would like to meet Getson's partner and that he had in mind a site that might present a "good opportunity for [them] to get in and do some developing" (GX T-308, at 5).

Getson finally introduced Boyland and Quinn at a dinner in March 2011, and the three discussed possible real estate projects in Boyland's district. Boyland touted an abandoned hospital in his district, stating that the State's Department of Health had approved plans to recommission the hospital site. He estimated that it could be bought at a bargain price of 8 to 12 million dollars, and they discussed purchasing the property and then selling it back at a profit after the city formally approved the redevelopment.

Getson testified that some 10 days later, Hermon called him to "ask for money on the Assemblyman's behalf," "$7,000," to pay for a lawyer (Tr. 414, 416). Hermon termed this a "personal ask" from Boyland, not intended to "go[] towards the campaign." (*Id*. at 1665.) Boyland later said he preferred to receive the money in cash. Getson subsequently brought the cash to a meeting at Boyland's district office on March 25, 2011, saying that it would be from himself and Quinn (Tr. 430); Boyland responded that he understood, and commented that "[y]ou guys are business" (GX T-104A, at 6). Before paying Boyland, Getson said that he and Quinn wanted Boyland to "help [them] get . . . state grants" to cover expenses associated with investing in "brownfield" sites (*id*. at 7), meaning real estate plagued by an environmental issue that needs to be treated prior to development[Tr. 250]; Boyland responded that "it's right here at home so it's a no-brainer" (*id*.). Interpreting this response to mean that securing state grants for real estate investments in Boyland's district was "something [Boyland] c[ould] do easily" (Tr. 433), Getson handed Boyland the $7,000.

A week later, Boyland gave Getson and Quinn a tour of the assembly district and pointed out various brownfield sites and the abandoned hospital they had previously discussed. Quinn reiterated his desire to buy the hospital property in anticipation of a profitable resale and asked Boyland "what kind of ways do you have to influence the city on the actual sale of the property?"

(GX T-107, at 48). Boyland cited his ability to steer state grants toward developments. (*See* GX T-107, at 67 ("the one thing that I can, I can probably, you know, more than likely, you know, uh, sell, is the sure thing when it comes to city and state financing and their support on the project").)

Quinn also inquired about the possibility of zoning changes to upgrade the neighborhood, and Boyland stated that such a task would "[n]ot [be] a problem" (*id*. at 25). Boyland further proposed demolishing certain buildings to create more uniformity in the area; when Quinn asked whether the contracts for these demolition projects could be granted to his associates, Boyland stated that that would be "[s]omething to do" (*id*. at 72), which Quinn understood to indicate that Boyland "positively thought [that] was a good idea" (Tr. 2160). Boyland also said that

> the good thing about what we're, what we're proposing here is that everything we've seen I'm in control of. You know, I'm the politician. I'm the guy that can make the move over on this end so we know the, the, the folks that can pull the, you know, sort of triggers we're looking for.

(GX T-107, at 69.)

At their next meeting to discuss the real estate project, Boyland offered a slightly changed approach. While Getson and Quinn would still buy the property for roughly $8 million, instead of selling it to the development company they would sell it to a non-profit Boyland controlled, "probably get[ting] 15 [million dollars]" for it. (GX T-120A, at 91.) Boyland also emphasized that he would still be able to deliver to Getson and Quinn the benefits that they had previously discussed, including: "writ[ing] you a couple of grants" (*id*. at 32) to help cover the costs of environmental remediation, awarding Quinn's associates the "demolition contracts" (*id*. at 77) worth several million dollars (*see* Tr. 2292), and "sew[ing] everything up" if there was ever a zoning issue (GX T-120A,

11

at 86). Boyland also embraced Quinn's idea of "bury[ing]" owners of the coveted properties in violations as a means of lowering the properties' value (*id*. at 35-36).

As to compensation for Boyland, Quinn suggested "put[ting] one of [his] people" on the staff of Boyland's non-profit entity as a no-show employee, allowing Boyland to retain his or her supposed salary, and Boyland said, "[w]e'll do it[,] [w]e'll do it." (*Id*. at 41.) Boyland also said, however, that he would expect to receive $250,000 for his role in the project. (*See* Tr. 618.) After Quinn expressed some reluctance, Boyland vowed that he was fully committed to the project, noting that "if [he] had any kind of qualms about it, I'd still be in Brooklyn" (GX T-120A, at 91):

> I understand what it takes to get these projects completed. Um, and I just, you know . . . shit, I just laid out my motherfuckin' pay line for you. It's where I am right now. I mean, what I want to do, my goal for myself is, like I said, over the next 3 to 4 years, work these projects, get them done.

(*Id*.)

Thereafter, neither Quinn nor Getson made any more payments to Boyland, although they did make a counteroffer to pay him $5,000 for each bribable official he could attract to the real estate scheme. Boyland declined, and there were no further discussions of the real estate scheme. Boyland stated that the type of people he would bring would be worth considerably more than $5,000.

### 3. *The Fraudulent Voucher Scheme*

The government presented multiple witnesses and exhibits to show that in 2007-2011, Boyland submitted to the State numerous requests for per diems and travel reimbursements for assembly district business trips that he did not take. For example, there were dates on which he

12

claimed such reimbursement for travel to and from Albany, New York, when instead he was in the Hamptons or out of the country on personal trips--or in New York City meeting with Getson or Quinn. The evidence showed that Boyland collected more than $71,000 as a result of such fraudulent vouchers.

4. *Mail Fraud Conspiracy With Respect to the Nonprofit Entity*

Finally, the government presented evidence, principally through testimony by Hermon, that Boyland diverted more than $56,000 of State funds to his own use. Members of the State Assembly are allotted moneys that they have discretion to have sent to nonprofit public-interest corporations. One to which Boyland had such funds sent was the nonprofit corporation Wayside Outreach and Development ("Wayside"). However, Hermon testified that Boyland essentially treated that money as "his money" (Tr. 1237) by, for example, having "Wayside[] . . . pay for large [campaign] events" (Tr. 1079).

B. *The Jury Instructions*

The district court instructed the jury as to the elements of each of the offenses that Boyland was alleged to have committed. To the extent pertinent to Boyland's contention that the instructions were not consistent with the honest-services fraud law as subsequently announced in *McDonnell*, the court's instructions included the following.

As to Counts Two and Eighteen, which alleged that Boyland had attempted to extort money under color of official right in violation of 18 U.S.C. § 1951, the jury was instructed that it

needed to find that Boyland had, *inter alia*, "used the authority of his office or position to obtain . . . money, goods or services," which the court equated with "represent[ing] him[self] as capable of doing something, or of refusing to do something, because of his official position." (Tr. 3110.) The court instructed that "[t]he focus of [that] inquiry" was "whether the money, goods or services were given to the defendant because of the defendant's mis[]use of his position," and whether "the defendant knew the giver's consent was wrongfully obtained -- that is, that the money, goods or services were given in connection with the defendant's misuse of his official position rather than being given voluntarily." (Tr. 3111-12.) The court told the jury that these principles also applied to Counts One and Sixteen, which alleged extortion conspiracy in violation of 18 U.S.C. § 1951(a). (*See* Tr. 3115-17.)

The instructions on Counts Six through Fifteen, charging honest-services wire fraud in violation of 18 U.S.C. § 1343, likewise highlighted the relevance of Boyland's elected position to the charge. In the course of instructing the jury on the first element the government needed to prove-- "[t]hat the defendant knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery or kickbacks" (Tr. 3143)--the court stated the following:

> A public official owes a duty of honest and faithful service to the public he served and [to] his public employer. When a public official solicits, agrees to receive or receives a corrupt payment for or because of official action, the official has breached his duty of honest and faithful disinterested service. The term "official act" includes the decisions o[r] actions generally expected of a public official, including but not limited to contacting or lobbying other governmental agencies, and advocating for his constituents.

(Tr. 3144.) The court stated that this principle was also applicable to Count Five, conspiracy to commit honest-services fraud. (*See* Tr. 3150.)

14

The court's instructions on the remaining counts, apart from a stray reference to an "official act" in the course of describing an illegitimate defense to a federal programs bribery charge (*see* Tr. 3126) and an overview of what amounts to bribery under New York law (*see* Tr. 3134-37), did not discuss actions taken in an official capacity as being a prerequisite for conviction.

C. *The Verdict*

The jury found Boyland guilty on all 21 counts charged in the Indictment. Boyland was sentenced as indicated above. This appeal followed.

## II. DISCUSSION

On appeal, Boyland challenges his conviction, contending principally that the jury charge as to Counts One through Nineteen was erroneous in light of the Supreme Court's subsequent decision in *McDonnell*, 136 S. Ct. 2355, which narrowed the interpretation of "official act" within the meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections prohibiting *quid pro quo* corruption. He acknowledges that he did not object to the instructions but argues that he is entitled to relief upon plain-error review. Boyland also challenges some of the trial court's evidentiary rulings.

The government concedes that the district court's unobjected-to instructions on Counts Five through Fifteen, the 11 honest-services fraud counts, were erroneous in light of *McDonnell*, but it contends that the error does not warrant relief under plain-error analysis. And it argues that the

15

court's other instructions were not affected by *McDonnell* and that there were no evidentiary or other errors.

For the reasons that follow, we conclude that the "plain error" standard is not met; and we find no basis for reversal in defendant's other contentions.

A. *The Plain-Error Standard*

The Federal Rules of Criminal Procedure allow limited review of an unpreserved error pursuant to Fed. R. Crim. P. 52(b), if it meets specific criteria. As stated by the Supreme Court,

> Rule 52(b) permits an appellate court to recognize a "plain error that affects substantial rights," even if the claim of error was "not brought" to the district court's "attention." Lower courts, of course, must apply the Rule as this Court has interpreted it. And the cases that set forth our interpretation hold that an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)); *see, e.g.*, *United States v. Olano*, 507 U.S. 725, 731-37 (1993); *Johnson v. United States*, 520 U.S. 461, 466-67 (1997); *United States v. Cotton*, 535 U.S. 625, 631-32 (2002). The *Marcus* Court emphasized that

> [t]he third criterion specifies that a "plain error" must "affec[t]" the appellant's "substantial rights." In the ordinary case, to meet this standard an error must be "prejudicial," which means that there must be a reasonable probability that the error affected the outcome of the trial,

16

*Marcus*, 560 U.S. at 262 (quoting *Olano*, 507 U.S. at 734-35), and that the "fourth 'plain error' criterion . . . permits an appeals court to recognize 'plain error' only if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings,'" *Marcus*, 560 U.S. at 265 (quoting *Johnson*, 520 U.S. at 467).

The burden of meeting the above criteria for relief under plain-error analysis is on the defendant. *See*, *e.g.*, *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). The government may point to parts of the record in an effort to counter any ostensible showing of prejudice the defendant may make. *See*, *e.g.*, *United States v. Young*, 470 U.S. 1, 16 (1985).

Boyland argues that, where the error a defendant raises on appeal results from a supervening Supreme Court decision, we should apply the modified version of the plain error test discussed in *United States v. Viola*, 35 F.3d 37, 41-43 (2d Cir. 1994) ("*Viola*"), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997). On the basis that in such a scenario the defendant would not have been sufficiently on notice to have objected to the error at trial, the modified plain error test would shift the burden to the government to demonstrate that the defendant did not suffer prejudice. *See Viola*, 35 F.3d at 41-43. In the wake of *Johnson v. United States*, 520 U.S. 461, 469-70 (1997), we have acknowledged doubt as to the continued viability of the modified plain error test but have not had the need to address it. *See*, *e.g.*, *United States v. Prado*, 815 F.3d 93, 102-03 (2d Cir. 2016). We similarly decline to address its continued viability here because, regardless of which party bears the burden with respect to the prejudice prong, we are convinced that Boyland did not suffer any prejudice.

17

B.  McDonnell

In *McDonnell*, the government and the defendant former governor of Virginia had agreed that, for purposes of considering whether a public official committed honest-services wire fraud and Hobbs Act extortion, the jury should determine whether the official, in exchange for loans or gifts, performed "official act[s]" as that term is defined in the federal bribery statute, 18 U.S.C. § 201(a)(3).  *See* 136 S. Ct. at 2365.  The Supreme Court ruled that, in instructing the jury, the trial court had interpreted that term too expansively.  *See id*. at 2374.

The *McDonnell* Court held that, in order to prove that the defendant performed an official act as that term is defined in § 201, the government must prove two factors.  First it must identify "a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official" that would involve "a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination."  *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)).  The Court noted that the subject of whether a state-created commission "would 'allocate grant money for'" a briber's desired project "qualif[ies] as [a] question[] or matter[] under § 201(a)(3)," as that is an issue that "is focused and concrete, and . . . involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing."  *McDonnell*, 136 S. Ct. at 2370.

Second, the government must prove that "the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so."  *McDonnell*, 136 S. Ct. at 2368.  The Court ruled that these criteria are not met by proof merely that an official hosted an event, meeting, or speech "related to" a pending question or matter.  *Id*. at 2370.

18

Nonetheless, the Court stated that while "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act,'" *id.* at 2368, such actions "could serve as evidence of an agreement to take an official act," *id.* at 2371. And a jury would be entitled to "conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *Id.* Further, the Court noted that the government is not required to prove that the defendant official actually performed the agreed task; it is enough for purposes of the federal bribery statute to show that the official "agree[d]" to make a decision or take an action. *Id.* at 2370-71. In addition, § 201 would be violated by an agreement to "us[e one's] official position to exert pressure on *another* official to perform an 'official act.'" *McDonnell*, 136 S. Ct. at 2370 (emphasis in original). If a public official agrees to "use[] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify as a decision or action for purposes of § 201(a)(3)." *McDonnell*, 136 S. Ct. at 2370.

C. *The Instructions in the Present Case*

Most of the counts against Boyland involved assessment of whether what he offered or sold amounted to an "official act," though some did not.

19

### 1. *Honest-Services Fraud: Counts Five Through Fifteen*

We agree with the parties that the district court's honest-services charge with respect to Counts Five through Fifteen in this case did not meet the standards set by *McDonnell*. The district court instructed the jury, *inter alia*, that an official act encompassed "decisions o[r] actions generally expected of a public official, *including but not limited to contacting or lobbying other governmental agencies*, and advocating for his constituents." (Tr. 3144 (emphasis added).) As *McDonnell* makes clear, however, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)--without more--does not fit th[e] definition of 'official act.'" *McDonnell*, 136 S. Ct. at 2372. The instruction that merely "contacting . . . other governmental agencies" qualified as an official act for purposes of § 1343 was therefore erroneous in light of *McDonnell*.

### 2. *Hobbs Act Extortion: Counts One, Two, Sixteen, and Eighteen*

While the government does not similarly concede that there was error in the instructions given to the jury with respect to the alleged Hobbs Act extortion offenses (whether attempted (Counts Two and Eighteen) or conspiratorial (Counts One and Sixteen)), we are inclined to view these instructions also as flawed. With respect to the honest-services wire fraud counts, both sides had requested instructions that included the terms by which § 201(a)(3) defines "official act." But their proposed instructions with respect to the Hobbs Act counts did not include that language, and the jury was told that in order to convict on these counts it needed to find that Boyland knew that any money he accepted "was offered in exchange for a specific exercise of [Boyland's] official powers" (Tr. 3111). *McDonnell* concerned the meaning of "official act" as used in 18 U.S.C.

20

§ 201(a)(3) because the parties agreed to use that definition for purposes of instructing the jury as to both honest-services fraud and Hobbs Act extortion. *See McDonnell*, 136 S. Ct. at 2365. However, in addition to considering Congressional intent, the Court's analysis turned upon constitutional concerns stemming from the breadth of the interpretation advanced by the government. *See id*. at 2372-73. Particularly troubling to the Court was the possibility of criminal penalties for innocuous conduct by government officials attempting to serve their constituents. *See id*. at 2372. We believe that the instructions provided to the jury here with regard to Hobbs Act extortion, not explicitly incorporating the definition of "official act" in 18 U.S.C. § 201(a)(3), suffered from the same flaws, in that they did not sufficiently inform the jury as to the nature of the power that the government was required to prove the defendant exercised or promised to exercise. The jury could have believed, as with the counts of honest-services wire fraud, that merely contacting another government agency sufficed to constitute a misuse of his "official powers."

### 3. *Federal Funds Bribery: Counts Four, Seventeen, and Nineteen*

We do not reach the same conclusion with respect to the instructions given for Counts Four, Seventeen, and Nineteen, alleging bribery and bribery conspiracy with respect to the carnival and real estate schemes, in violation of 18 U.S.C. § 666. That section is more expansive than § 201, in which "official act[s]" are limited to acts on pending "question[s], matter[s], cause[s], suit[s], proceeding[s], or controver[ies]," 18 U.S.C. § 201(a)(3). Section 666 prohibits individuals from "solicit[ing] . . . anything of value from any person, *intending to be influenced* or rewarded *in connection with any* business, transaction, or series of transactions of [an] organization, government,

21

or agency." 18 U.S.C. § 666(a)(1)(B) (emphases added). We do not see that the *McDonnell* standard applied to these counts.

4.    *Voucher Fraud and Other Conspiracy: Counts Three, Twenty, and Twenty-One*

The remaining three counts, alleging conspiracy to commit bribery and violate the Travel Act (Count Three), voucher fraud (Count Twenty), and mail fraud conspiracy (Count Twenty-One), likewise do not depend on the meaning of official act under § 201(a)(3). We do not see error in the instructions on these counts.

D. *Effect on Boyland's Substantial Rights*

While the instructions with respect to the honest-services fraud and Hobbs Act extortion counts were erroneous in light of the standard set by *McDonnell*, we cannot conclude that the errors affected Boyland's substantial rights. The carnival and real estate schemes to which Boyland agreed with Getson and Quinn were concrete matters that, in order to proceed as planned, required formal governmental decisions. City licenses and permits were required for the operation of a carnival. And City or State approvals were required in order to secure grant money, to award the contemplated demolition contracts, and to enact zoning changes. All of these approvals would require the formal exercise of governmental power.

Boyland promised that he would ensure that all of the necessary governmental actions occurred. For example, with respect to the carnival scheme, he stated that he already had the City's

HPD "locked up" and that its approval would be forthcoming. He undertook to provide letters to the Commissioner of the City's Department of Consumer Affairs ("DCA") that "vouch[ed]" for Weiner's character (GX LC-2A); Boyland expressed his "strong support for these permits[,] . . . request[ing] that [DCA] grant them expeditiously"; and he stated, "I know that you will look favorably on this application and grant your approval" (GX LC-2E).

Similarly, with respect to the real estate scheme, Boyland assured Getson and Quinn that he would get them State grant money for the renovation of the building, would have zoning changes implemented, and would see that Quinn's associates were awarded lucrative demolition contracts. While making these promises and assuring Getson and Quinn that he had locked up approvals for the carnival scheme, Boyland was, as described in Parts I.A.2. and I.A.1. above, asking Getson and Quinn for money for various of his projects or for his personal use.

In sum, all of Boyland's dealings with Getson and Quinn involved concrete matters that, in order to proceed, needed to be brought before public officials or agencies that would have to make formal and focused administrative decisions. In connection with each matter, Boyland agreed to ensure that favorable governmental decisions would be made, whether for licensing, work contracts, zoning, or funding. Although the jury was not instructed as to its need to find that the matters were concrete, that they required focused governmental decisions, and that Boyland took action on these matters, we see no reasonable possibility, in light of the record as a whole, that that flaw affected the outcome of the case.

E. *Other Arguments*

Boyland's other arguments lack merit and do not warrant extended discussion. They include a claim that his convictions on Counts Twenty and Twenty-One should be vacated on the ground of prejudicial spillover from counts as to which we have concluded that Boyland is not entitled to relief on plain-error review, and a challenge to the admission of certain testimony by the undercover FBI agents on a ground Boyland did not mention in the district court.

## CONCLUSION

We have considered all of Boyland's arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.