NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 19-2739

————————

UNITED STATES OF AMERICA

v.

CHAKA FATTAH, SR.,

Appellant

————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 2-15-cr-00346-001)
District Judge: Honorable Harvey Bartle, III

————————

Submitted Under Third Circuit L.A.R. 34.1(a)
April 23, 2020

Before: AMBRO, SHWARTZ, and BIBAS, Circuit Judges

(Opinion filed  May 14, 2020)

————————

OPINION[*]

————————

AMBRO, Circuit Judge

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Chaka Fattah served as a member of the United States House of Representatives for Pennsylvania's Second Congressional District for over two decades. Suspicion of corruption led to an investigation and, ultimately, a 22-count indictment based on criminal conduct for his political and financial benefit. After a five-week trial, the jury found him guilty on all counts. *United States v. Fattah* (*Fattah I*), 914 F.3d 112, 145 (3d Cir. 2019). The District Court granted Fattah's motion of acquittal on three of those counts and sentenced him to 120 months' imprisonment on the remaining counts. On appeal, we held that the Supreme Court's intervening decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), required us to vacate for retrial Fattah's conviction on five counts relating to bribery and money-laundering. *Fattah I*, 914 F.3d. at 189. We also reinstated two of the acquitted counts. *Id.*

On remand, the Government elected not to retry Fattah on the remanded counts, and the Court resentenced him to the same 120 months on the remaining counts of conviction. Fattah appeals, arguing that his sentence on remand is procedurally unreasonable. We disagree and thus affirm.

I.     Background

Fattah was a prominent fixture in Philadelphia politics for more than thirty years. He began his career in the Pennsylvania General Assembly before being elected to Congress in 1994, where he served from 1995 until 2016. In 2006 he ran unsuccessfully for Mayor of Philadelphia, amassing large campaign debts. In 2015 a grand jury indicted Fattah and four associates for engaging in criminal activity for their political and financial benefit. The counts were for RICO conspiracy, conspiring to commit mail,

wire, bank, and honest services fraud, defrauding the United States, falsification of records, bribery, money-laundering, and making false statements to a financial institution. The jury heard evidence about Fattah's leadership and participation in five distinct schemes undertaken over the course of a decade. The facts of each scheme are detailed in *Fattah I*, 914 F.3d at 127–39. In brief, Fattah's conduct included the following.

    **1.   The Loan Repayment Scheme.** Just before the 2007 Philadelphia Mayoral Primary, Fattah's campaign approached Albert Lord, II, then-CEO of Sallie Mae, about supporting a major media buy. Lord offered to contribute $1 million and proposed structuring the transaction as a loan to the campaign's media consultant LSG Strategies, Inc. to avoid contribution limits. After Fattah lost the primary, the campaign returned $400,000 of the unused funds. Later that year, Lord sought to collect the remaining $600,000. Fattah along with two associates conspired with Thomas Lindenfeld, owner of LSG Strategies, to repay the loan with misappropriated charitable and federal grant money from Fattah's nonprofit entity, Educational Advancement Alliance ("EAA"). EAA and the campaign undertook substantial efforts to cover up this loan repayment scheme, and ultimately the nonprofit ceased operations.

    **2.   The College Tuition Scheme.** Fattah defrauded his campaign and its lenders by using campaign funds to pay his son's college tuition and student loan debt. As part of the scheme, between 2007 and 2011 Gregory Naylor's firm, Sydney Lei and Associates (SLA), made over $23,000 of payments to, among others, Drexel University. Fattah's campaign reimbursed SLA through payments disguised as "election day operation expenses." *Id.* at 134–35.

**3. The Fake Conference Scheme.** In late 2011, EAA applied for a grant from the National Oceanic & Atmospheric Administration ("NOAA") to support a conference for students interested in science, technology, engineering, and math at minority-serving institutions. NOAA approved a $50,000 grant and transferred the money to EAA's bank account. Although the conference never occurred, Karen Nicholas, the executive director of EAA, submitted a vague report to NOAA describing the event and never responded to its follow-up requests for more information given the inconsistencies in the report. At least some funds were used to pay for services performed by Naylor for EAA.

**4. The Blue Guardians Scheme.** The Fattah campaign also owed money to LSG Strategies. After making a series of small payments, Fattah suggested that the firm create an entity to address environmental issues and ocean pollution so that he could repay his debt through a federal appropriation to the phantom entity. Although Lindenfeld, owner of LSG Strategies, incorporated an entity, Blue Guardians, to receive this appropriation and applied for federal funding, he became uncomfortable with the scheme after he was contacted by a news reporter and eventually rescinded his application. Having obtained Lindenfeld's agreement to write off the campaign debt, Fattah falsified campaign reports to show that the debt was paid in full.

**5. The Fattah-Vederman Bribery Scheme.** Herbert Vederman, a successful businessperson who served in Edward Rendell's mayoral and gubernatorial administrations, assisted on Fattah's campaign for mayor. After the campaign, Vederman negotiated the forgiveness of $70,000 of campaign debt. He also provided a series of payments to Fattah and his family members in exchange for favors. For example, in

4

2011 Fattah and his wife, Renee Chenault-Fattah, applied for a mortgage loan to purchase a second home in the Poconos from the Credit Union Mortgage Association ("CUMA"). It required the Fattahs to show they had sufficient liquid reserves for mortgage payments on the second home. The next day, Chenault-Fattah emailed Vederman about purchasing her Porsche for $18,000. Vederman promptly wired the money to Fattah's bank account. When CUMA asked about the source of the $18,000 payment, Vederman and Fattah forged documents to show that Vederman had purchased a Porsche from the Fattahs even though the car remained in Chenault-Fattah's possession. Just days later, Fattah hired Vederman's girlfriend, Alexandra Zionts, to ensure that a gap in her federal employment did not jeopardize her eligibility for federal retirement benefits.[1]

The jury heard evidence pertaining to these schemes during Fattah's trial. After 15 hours of deliberation, it, as already noted, convicted Fattah on all counts. He moved for acquittal on several of these counts, and the District Court granted his motion on the convictions for bank fraud and making false statements to a financial institution after determining that CUMA was not a financial institution. (Counts 19 and 20). *Fattah I*, 914 at 145. It also acquitted him of falsifying records (Count 21). *Id.* The Court sentenced Fattah to concurrent terms of 60 months' imprisonment for conspiracy to commit bribery (Count 16) and 120 months' imprisonment on the remaining counts, followed by three years of supervised release.

---

[1] There are other examples of Fattah and Vederman exchanging favors. For example, in 2010, Vederman wired over $5,000 to Fattah's son. During this period, Fattah aggressively promoted Vederman to the Obama Administration for an ambassadorship.

On appeal, we held that Fattah's and Vederman's convictions for bribery and money-laundering had to be vacated and retried before a properly instructed jury after the Supreme Court's intervening decision in *McDonnell* refined the definition of an "official act."[2] *Fattah I*, 914 F.3d at 152–59. We also held that CUMA is "an organization which finances or refinances [ ] debt secured by an interest in real estate" under 18 U.S.C. § 27, and thus qualified as a financial institution. *Id.* at 183, 185. As a result, we reinstated Fattah's and Vederman's convictions for bank fraud and making false statements to a financial institution (Counts 19 and 20) and remanded those counts for sentencing.

On remand, the Government elected not to retry Fattah on the remanded bribery and money-laundering counts. This left him convicted of RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count 1); conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349 (Count 2, based on the loan repayment scheme); conspiracy to commit honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349 (Count 3, based on the Blue Guardian scheme); conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341, 1349 (Count 4, based on the college tuition scheme); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 5–10, based also on the college tuition scheme); falsification of

_____

[2] The Supreme Court issued *McDonnell* one week after the jury verdict. *McDonnell* interpreted 18 U.S.C. § 201(a)(3)'s definition of an "official act" to require a "'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official," and that the "public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding or controversy, or agreed to do so." 136 S. Ct. at 2368 (quoting § 201(a)(3)). Because the jury had not been instructed on *McDonnell*'s definition of "official act," we held that at least one of the "official acts" charged in the indictment did not qualify under *McDonnell*'s definition. As we could not know whether the jury verdict rested on that act or others, all counts connected to Fattah's alleged official acts would need to be retried. *Fattah I*, 914 F.3d at 154–57.

6

records, in violation of 18 U.S.C. § 1519 (Counts 11–15); bank fraud, in violation of 18 U.S.C. § 1344 (Count 19, based on the sham car sale); and making a false statement to a financial institution, in violation of 18 U.S.C. § 1014 (Count 20, also based on the sham car sale).

The revised Presentence Investigation Report calculated a new Sentencing Guidelines Range of 151–188 months, 59–74 months below Fattah's initial Guidelines range. The Government recommended that the District Court impose the same ten-year term of imprisonment as it had previously because Fattah's criminal activity was "neither isolated nor a product of a single criminal choice." App. 183. Fattah argued vigorously that the substantial reduction in his Guidelines range and exemplary conduct during his two-and-a-half years of incarceration warranted a significant reduction from his initial sentence. Finding that Fattah had "abused the trust [the people of the Second Congressional District of Pennsylvania] placed in [him] time and time again," the Court imposed the same concurrent 120-month sentence on all counts. App. 286. This appeal followed.

II.     Discussion[3]

Fattah did not object to his sentence as procedurally unreasonable before the District Court. Thus we review his claims for plain error. *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (*en banc*). To succeed under this standard, three conditions must be met: (1) there is an error; (2) it is "plain—that is to say, clear or

---

[3] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Fattah's appeal under 28 U.S.C. § 1291 and jurisdiction to review Fattah's sentence under 18 U.S.C. § 3742(a).

obvious"; and (3) it "affected the defendant's substantial rights," that is, there is a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904-05 (2018) (internal quotation marks and citation omitted). "Once those three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1905 (internal quotation marks and citation omitted).

We require district courts to follow a three-step sentencing process. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). First, they "must continue to calculate a defendant's Guidelines sentence precisely as they would have before [*United States v.*] *Booker*[, 543 U.S. 220 (2005)]." *Id.* Next, they must rule on the parties' motions, state whether they are granting a departure, how such a departure affects the Guidelines calculation, and account for any relevant advisory case law. *Id.* Finally, we require sentencing judges "to exercise[ ] [their] discretion by considering the relevant [18 U.S.C. § 3553(a)] factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines." *Id.* (alterations in original) (internal quotation marks and citations omitted). Fattah contends that the District Court erred on this final step, and that it should have given more consideration to the change in his Guidelines range and his exemplary post-conviction behavior.

District courts must state their reasons for imposing a particular sentence. *Rita v. United States*, 551 U.S. 338, 356 (2007) ("A public statement of those reasons helps provide the public with the assurance that creates that trust [in the judicial institution].").

8

The sentencing judge must "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.*

Recently, the Supreme Court clarified that the sentencing court does not have to provide an explanation when it does not reduce a sentence proportionately to the change in the applicable Guidelines range on resentencing. *Chavez-Mesa v. United States*, 138 S. Ct. 1959, 1966–67 (2018). There the sentencing court did not explain its decision to reduce a sentence on petitioner's motion for reduction of sentence based on a retroactive Guidelines amendment. The Supreme Court noted that it was "not aware of any law or convincing reason" to require such a statement. *Id.* at 1966. Instead, it reemphasized the need for the court to provide some "reasoned basis" for its resentencing decision. *Id.* (quoting *Rita*, 551 U.S. at 356).

Just as in *Chavez-Meza*, Fattah's argument that the District Court should have elaborated on its decision not to reduce his sentence proportionately to the reduction in the applicable Guidelines range fails. Here the Court provided a "reasoned basis" for its decision to enter the same 120-month sentence. It explained that "the need for a general deterrence is a priority," and a "significant sentence[ ]" would likely deter "those in high places . . . from [abusing] the public trust." App. 284. It reemphasized the grave damage resulting from Fattah's various schemes, stating that his "flagrant conduct undermines the confidence of the citizenry in the integrity of all public institutions and public officials. This cynicism saps the strength of [ ]our democracy[.]" App. 286. Thus we are left with

9

no doubt why the Court imposed the same sentence despite the change in Fattah's Guidelines range.

In addition, despite Fattah's arguments to the contrary, the District Court explicitly noted that it "considered today [his] good prison record, [his] enrollment in various educational programs and [his] mentoring of numerous inmates since the time [he had] been in prison. All of this, of course, is to [his] credit." App. 284. While "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing," *Pepper v. United States*, 562 U.S. 476, 491 (2011), a "court's failure to give mitigating factors the weight a defendant contends they deserve [does not] render[ ] the sentence unreasonable," *United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007).

\* \* \* \* \*

The District Court did not commit plain error in resentencing Fattah. It entered a below-Guidelines sentence of 120 months' imprisonment, showing leniency at resentencing, just as it did in its 2016 sentencing decision. As we must defer when the Court "adequately explain[s] the chosen sentence," *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (*en banc*), and that occurred here, we affirm its sentence.